STATE of Minnesota, Respondent,

v.

Everado NMN CRUZ–RAMIREZ,
Appellant.

No. A08–1420.

Supreme Court of Minnesota.

Aug. 27, 2009.

500

Sharon E. Jacks, Assistant Public Defender, St. Paul, Minnesota, for appellant.

Lori Swanson, Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

OPINION

MEYER, Justice.

A Hennepin County jury found appellant Everado NMN Cruz–Ramirez (Cruz) guilty of four counts of first-degree murder and two counts of second-degree murder for the shooting death of Heli Hernandez Leon, and six counts of attempted first-degree murder and six counts of attempted second-degree murder for the shooting injuries of three other men. The district court entered convictions on each guilty verdict. The court sentenced Cruz to life in prison for first-degree premeditated murder, plus three consecutive 186–month sentences for attempted first-degree murder of the other victims. On direct appeal, Cruz argues: (1) the court erred by admitting expert testimony on gang activity; (2) the court plainly erred in its jury instructions; (3) there was insufficient evidence to convict Cruz of first-degree murder; and (4) Cruz's unsentenced convictions should be vacated. In his pro se supplemental brief, Cruz makes five additional arguments. We affirm the district court, but modify Cruz's convictions by vacating his unsentenced convictions.

On August 25, 2007, shortly before 7:45 p.m., a red Ford Probe and a silver Toyota parked at the intersection of E.M. Stately Street and Ogema Place in south Minneapolis. The Ford was parked in front, and its five passengers got out. Three female passengers stayed next to the Ford; two male passengers, Carlos Ocampo and Omar Morales, went to speak to their friends in the Toyota. The Toyota had parked a few yards behind the Ford. Heli Hernandez Leon sat in the driver's seat, and Miguel Carranza sat in the back seat behind Hernandez Leon. Israel Jimenez left the back seat of the Toyota, and joined Ocampo and Morales at the driver's side open window. The three men stood talking to Hernandez Leon.

A black car pulled up across the street from the Toyota and stopped; a woman was driving, with another person in the back seat. A man left the right front passenger door and asked, "Que barrio?"[1] Before anyone spoke, the man pointed a gun at the three men standing next to the

---

1. Witnesses defined the term "que barrio," which was the phrase used right before the shootings happened. Morales said "it's like when that person is part of a gang," or, "[w]hat gang are you from?" A female passenger from the Ford testified that it meant "What gang are you from?" Ocampo testified that it meant "Where are you from?" He said the term is used to find out what gang the other person is representing.

Toyota and started firing. The man walked toward the Toyota as he fired the gun about five times. One witness testified the man was shooting "at everyone"; another witness said that the man aimed "[a]t the people who were there, firing the gun first at Jimenez," then at Hernandez Leon, then Carranza.

At the time, several women were standing in a parking lot near the shooting. One woman, F.M., had known Cruz for a few months. Upon hearing gunshots, F.M. turned around and recognized Cruz as the shooter. To another woman F.M. said, "Oh my god, that was [Cruz]."

When police arrived at the intersection a few minutes later, the black car and its passengers were gone. Police found four shooting victims: two men inside the Toyota, Hernandez Leon and Carranza, and two of the men who had been standing near the driver's side window, Jimenez and Morales. Hernandez Leon had died from a gunshot wound in his chest by the time officers arrived on the scene.

Carranza had been shot twice. The first bullet went through his arm and hit his chest. Carranza testified that the shooter, seeing "that nothing happened the first time," shot Carranza again. Carranza was then shot in his left flank—the bullet traveled across his abdomen, spleen, stomach, and into the liver. Jimenez had been shot in the back of both thighs and fell to the ground immediately after being shot. Morales was grazed by a bullet on his left hip as he ran away.

Witnesses saw two men run from the scene of the shootings into a house about a block away. Two women who lived at the house testified at trial that around the time of the shooting, Cruz and another man walked quickly into the house. Cruz told them the police were outside; both men then removed their shirts, put them on a couch, and left. Police recovered the

two shirts; both had blue and white horizontal stripes.

With the knowledge of Cruz's name, investigators were able to find Cruz's picture and prepare two photo lineups on the night of the shootings. Shooting victims Morales and Jimenez each identified Cruz. Morales also said that the shooter had been wearing a blue shirt with white stripes. One of the females who had been riding in the Ford, who had run and hid when she heard gun shots, also identified Cruz from a photo lineup. Ocampo, who had been standing next to the shooting victims but was uninjured, said the shooter had a white shirt with blue horizontal stripes. Ocampo also said that Cruz's photo "looked closest" to that of the man Ocampo witnessed shooting. Shooting victim Carranza and another female passenger were not able to identify anyone.

No weapon was ever recovered, but the police found five discharged casings and one fired bullet at the scene. The police investigation of the shooting revealed that the recovered casings and bullet were from the same gun and consistent with bullets from a .38 caliber gun.

On October 4, 2007, Cruz was indicted by a grand jury on 18 counts. Cruz's charges relating to the death of Hernandez Leon were: first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2008); first-degree murder for the benefit of a gang, Minn.Stat. §§ 609.185(a)(1), 609.229, subd. 2 (2008); first-degree murder during a drive-by shooting, Minn.Stat. § 609.185(a)(3); first-degree murder for the benefit of a gang during a drive-by shooting, Minn.Stat. §§ 609.185(a)(3), 609.229, subd. 2; second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2008); and second-degree intentional murder for the benefit of a gang, Minn.

Stat. §§ 609.19, subd. 1(1), 609.229, subd. 2.

For each of the three men injured by the shooting, Cruz was charged with: first-degree attempted murder during a drive-by shooting, Minn.Stat. §§ 609.17 (2008), 609.185(a)(3); first-degree attempted murder for the benefit of a gang during a drive-by shooting, Minn.Stat. §§ 609.185(a)(3), 609.229, subd. 2; second-degree attempted murder, Minn.Stat. § 609.19, subd. 1(1); and second-degree attempted murder for the benefit of a gang, Minn.Stat. §§ 609.19, subd. 1(1), 609.229, subd. 2.

The State presented several pieces of gang evidence at trial. The two women from the house Cruz had entered after the shootings testified that Cruz was in the Surenos 13 gang. They knew this because of his tattoos; a photo was introduced of Cruz showing he has "13" and "SUR" tattooed on his arms. One woman said she knew some members and symbols of the Surenos 13 gang. During that woman's testimony, several photos were introduced into evidence of Cruz at a party where people were wearing such symbols, although no one but Cruz was directly identified as a member of the gang.

Morales identified himself as a member of the Vatos Locos gang. He testified that the Vatos Locos gang is a rival of the Surenos 13. Morales said that the Vatos Locos identify themselves with black and white colors and a specific hand signal; he said the Surenos 13 wear blue and white, with a different hand signal. Morales testified that the Vatos Locos have at least 70 members, and the Surenos 13 have at least 400 members.

Ocampo, who had been next to the victims at the time of the shooting, was identified by a witness as also being a Vatos

Locos member. Ocampo testified about the characteristics of the Vatos Locos and that the gang claimed northeast Minneapolis and part of south Minneapolis, mainly around Lake Street, as its territory. Ocampo said the Surenos 13 is a rival gang of the Vatos Locos and claims south Minneapolis as gang territory.

Detective Bruce Folkens, the lead detective in the case, also testified. Folkens said that the Surenos 13's territory is in south Minneapolis, in an area that encompasses where the shooting took place. Folkens testified that the victims were either members or close associates of the Vatos Locos, a rival gang located on the north side of Minneapolis. Because the two gangs are "strong rivals," infringement into another gang's territory would be seen as a "bad thing." Folkens also testified that "que barrio" meant "[w]here do you live, what do you claim, what gang do you affiliate with? It's a question to identify who you're with."

The State called police officer Francisco Porras to testify as a gang expert. The defense objected on the basis of Porras's expert qualifications and the district court conducted voir dire outside the presence of the jury. Porras's background includes twelve years of experience on the Minneapolis police street patrol, over two years as a gang investigator on the Metro Gang Strike Force, had been involved with major gang-related investigations, and participation in gang-related training and presentations. Porras was then asked to describe how he and the task force identify gang members. Porras talked about the Minnesota Gang Strike Task Force's ten-point criteria to determine gang membership, and specifically discussed his knowledge of those criteria as they related to the Surenos 13.[2] Although the de-

---

**2.** The ten criteria are: (1) admits gang membership or association; (2) is observed to as-

fense maintained its objection, the court allowed Porras to testify.

During his testimony, Porras repeated his gang-related work experience and further described how he regularly works with street officers and does his own investigations on gang members. Porras described several specific characteristics of the Surenos 13 gang, such as colors, signs, and territory. Porras also testified to the gang's pattern of criminal activity, which includes street robberies that have led to homicides, drug dealing, drive-by shootings, and assaults. Porras also described the Vatos Locos' criminal activity and the rivalry between the two gangs. Porras did not give an opinion as to whether Cruz was a gang member or whether the crimes were committed for the benefit of a gang.

Defense theories at trial included mistaken identity, lack of police investigation, and that the witnesses personally involved with the Surenos 13 lied to protect their own friends and family. Cruz did not testify. The jury found Cruz guilty on all charged counts, and the district court entered convictions on each guilty count. Cruz was sentenced for the first-degree premeditated murder of Hernandez Leon to a life sentence with no possibility of release. Cruz was also sentenced to three 186–month consecutive sentences for the attempted first-degree murder of the other three victims.

## I.

We first address Cruz's claim that the district court erred by allowing the State to introduce the gang expert testimony of Officer Porras. Cruz argues that the testimony was based on hearsay and "possibly violated [his] confrontation rights." Cruz also argues that the testimony was not helpful to the jury because it spoke to ultimate issues of the case. Lastly, Cruz argues the testimony was unduly prejudicial.

 Under Minn. R. Evid. 702, expert testimony will be allowed if "the testimony will assist the jury in resolving factual questions presented." *State v. Lopez–Rios*, 669 N.W.2d 603, 612 (Minn.2003). However, Minn. R. Evid. 403 provides that otherwise admissible evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. This court reviews evidentiary rulings for an abuse of discretion and will not reverse a district court's findings unless the findings are clearly erroneous. *State v. Mahkuk*, 736 N.W.2d 675, 686 (Minn.2007). "Reversal is warranted only when the error substantially influences the jury's decision." *Id.* (internal quotation marks omitted).

 We recently have addressed the use of gang expert testimony in numerous cases. *See, e.g., id.* (listing five recent cases regarding gang expert testimony). In these cases, we have emphasized that expert testimony on gang activity is often "neither helpful nor necessary and can be highly prejudicial, due to the potential for

---

sociate on a regular basis with known gang members; (3) has tattoos indicating gang membership; (4) wears gang symbols to identify with a specific gang; (5) is in a photograph with known gang members and/or using gang-related hand signs; (6) name is on a gang document, hit list, or gang-related graffiti; (7) is identified as a gang member by a reliable source; (8) arrested in the company of identified gang members or associates; (9) corresponds with known gang members or writes and/or receives correspondence about gang activities; and (10) writes about gangs, which would be graffiti on walls, books, and/or paper.

An individual who meets three of the criteria is considered a gang member; two or less is an associate. *See State v. Lopez–Rios*, 669 N.W.2d 603, 610 n. 2 (Minn.2003).

experts to unduly influence the jury." *State v. Jackson,* 714 N.W.2d 681, 691 (Minn.2006). When feasible, we recommend that testimony from witnesses with first-hand knowledge be used to prove the "for the benefit of the gang" element, and we advise against the use of expert testimony to prove the gang membership of the specific defendant. *Mahkuk,* 736 N.W.2d at 686. In summary, gang expert testimony must "add precision or depth to the jury's ability to reach conclusions about matters that are not within its experience" to be admissible. *State v. DeShay,* 669 N.W.2d 878, 888 (Minn.2003).

To prove the gang crimes, the State had to establish that the Surenos 13 met the statutory definition of a criminal gang and that Cruz committed the crimes "for the benefit of, at the direction of, in association with, or motivated by involvement with [the Surenos 13], with the intent to promote, further, or assist in criminal conduct by gang members." Minn.Stat. § 609.229 (2008). A "criminal gang" is defined as:

> any ongoing organization, association, or group of three or more persons ... that: (1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9 [which includes murder, assault, burglary, kidnapping, manslaughter, robbery, and drive-by shooting]; (2) has a common name or common identifying sign or symbol; and (3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.

Minn.Stat. § 609.229, subd. 1.

■ The State introduced Porras's testimony to establish that the Surenos 13 and the Vatos Locos each had a pattern of criminal activities that would qualify them as gangs under this statutory definition. We have said that expert testimony on the general criminal activities of a gang assists the jury in deciding whether the commission of crimes is one of the primary activities of the gang. *See Jackson,* 714 N.W.2d at 691–92. In this case, Porras testified to the criminal activity of both gangs, a subject on which the lay witnesses did not testify. The testimony was necessary to establish the elements of "for the benefit of the gang," and was not cumulative. *See id.*

The State stayed within the parameters we have set out for gang expert testimony when it refrained from asking Porras to give an opinion on whether Cruz was a gang member. Porras did not rely on information that was outside of his personal knowledge. He did not give unhelpful conclusory legal opinions. *See State v. Moore,* 699 N.W.2d 733, 740 (Minn.2005) (expert medical witness calling victim's injury a "serious bodily injury" was improper because it told the jury what result to reach in whether the victim's injury constituted "great bodily harm").

■ The testimony also was not based on inadmissible hearsay or a violation of Cruz's confrontation rights. We have expressed concern that gang expert testimony might "launder inadmissible hearsay evidence," such as an expert opining that the defendant is associated with a gang based on information the expert did not collect personally. *DeShay,* 669 N.W.2d at 886; *see also United States v. Mejia,* 545 F.3d 179, 198–99 (2d Cir.2008) (holding that expert testimony was based on inadmissible hearsay and was a violation of confrontation rights because expert did not piece together and analyze information but instead just repeated what he heard from others). That concern with gang expert testimony is not present in Porras's testimony: Porras gave a summary of knowledge he had gained through years of investigations and was not relying solely on another's statements as the basis of his

knowledge. Porras also limited his testimony to describing the criminal activity the two gangs commonly engage in—he did not testify that the specific crimes in this case were for the benefit of a gang. Accordingly, the district court did not err in allowing Porras's expert testimony on the Surenos 13 and Vatos Locos patterns of criminal activity.

■ The district court may have erred by allowing expert testimony that was duplicative of the lay witnesses' testimony, such as information on the identifying characteristics and the rivalry of the gangs. But any error must have "substantially influence[d] the jury's decision." *Lopez–Rios*, 669 N.W.2d at 613 (internal quotation marks omitted). There is no such influence here: there was independent evidence that Cruz was a member of a gang and his crimes were committed in furtherance of that membership. Several witnesses in this case testified about the two gangs, and two witnesses specifically linked Cruz to the Surenos 13. Witnesses connected Cruz's statement before the shootings directly to gang activity. We conclude there is no reasonable possibility that Porras's testimony substantially influenced the guilty verdict and therefore hold there was no reversible error.

## II.

We next address Cruz's claim that the district court plainly erred in its jury instructions. Cruz concedes that there was no objection to the instructions on the record. In fact, the record reflects that before the instructions were given, the State and defense counsel discussed the instructions for over an hour on Friday afternoon. Both the State and defense counsel made edits over the weekend and then counsel met with the court for two hours on Monday morning to condense the corrections and edit the instructions.

When the court specifically asked if there was anything further the parties wanted on the record, defense counsel replied "no."

■ The failure to object to jury instructions generally constitutes waiver of that issue on appeal. *State v. Pendleton*, 725 N.W.2d 717, 730 (Minn.2007); Minn. R.Crim. P. 26.03, subd. 18(3). Yet plain errors affecting substantial rights may be considered if an appellant establishes that "a district court's ruling (1) was error, (2) that the error was plain, and (3) that the error affected appellant's substantial rights." *State v. Ihle*, 640 N.W.2d 910, 916 (Minn.2002). If those three prongs are met, then we "assess[ ] whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings." *State v. Hughes*, 749 N.W.2d 307, 315 (Minn.2008) (internal quotation marks and citation omitted).

### Instructions on Transferred Intent

■ Cruz first argues that the district court plainly erred by instructing the jury on transferred intent and by including transferred intent language when defining each crime's intent element. While instructing the jury on the elements of first-degree premeditated murder, the court stated:

> If Defendant acted with premeditation and with intent to cause the death of a person other than the deceased, then the element of premeditation and intent to kill is satisfied even though the Defendant did not inten[d] to kill Heli Hernandez–Leon.

Further, in outlining the elements of every intentional murder crime with which Cruz was charged, the court defined intent as acting "with the intent to kill Heli Hernandez–Leon or another person."

 Before we examine for plain error, Cruz must demonstrate there was an error. *Pendleton*, 725 N.W.2d at 730. District courts are given "considerable latitude in choosing jury instructions." *State v. Vance*, 734 N.W.2d 650, 656 (Minn.2007) (internal quotation marks omitted). When this court reviews jury instructions for error, the instructions are reviewed in their entirety to determine whether they fairly and adequately explain the law. *Ihle*, 640 N.W.2d at 916. Only an instruction that materially misstates the law is error. *See State v. Kuhnau*, 622 N.W.2d 552, 556 (Minn.2001).

Under the statutes for intentional murder, a person must act with the "intent to effect the death of the person or of another." *See, e.g.*, Minn.Stat. § 609.185(a)(1). In *State v. Sutherlin*, this court recognized that Minnesota's homicide statutes, including premeditated murder, incorporate the doctrine of transferred intent. 396 N.W.2d 238, 240 (Minn.1986). That doctrine, derived from the common law, stands for the principle that " 'a defendant may be convicted if it is proved he intended to injure one person but actually harmed another.'" *State v. Hall*, 722 N.W.2d 472, 477 (Minn.2006) (quoting 9 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice–Criminal Law and Procedure* § 44.8 (3d ed.2001)).

Cruz argues that the transferred intent doctrine does not apply to this case because there is no evidence to show that any of the victims were accidental, unintended victims. Cruz relies on our decision in *Hall*, where the defendant and the victim argued at a gas station and then the defendant was attacked by three other men in the parking lot. 722 N.W.2d at 475. The defendant retrieved a gun from his home, and then returned to the gas station and killed the victim. *Id.* The State attempted to advance a theory that if the defendant left his home intending to kill the men who jumped him, there was enough proof to find he premeditated the victim's death. *Id.* at 476. But we concluded that transferred intent did not apply; the three men were no longer at the gas station, the defendant had conceded he had intentionally killed the victim, and thus "there was no evidence that [the victim] was an unintended victim . . . ." *Id.* at 478.

 Cruz's reliance on *Hall* is misplaced; based on the unique facts of that case, we held that the transferred intent doctrine does not apply where there is no possibility that the victim was unintended. Those circumstances are not reflected here. Cruz shot a semiautomatic weapon multiple times toward several people in close proximity. The evidence, while showing intent to kill and ·premeditation, does not unerringly show that each fired bullet was intended for the person that it hit. As demonstrated by *State v. Holliday*, transferred intent allows evidence of an intent to harm "someone" to transfer to the person actually harmed when there is a possibility the victim was not the intended recipient of the specific act. 745 N.W.2d 556, 562 (Minn.2008). Hernandez Leon's death and the injuries of the other men fall within the rule; thus, the court's instructions on transferred intent were not error.

### Instructions on Elements of Attempted Murder

 Cruz also argues that the district court erred in its instructions in reciting the elements for each attempted murder charge.[3] Before going through the ele-

---

**3.** Cruz also contends that the district court erred in its recitation of the elements of first-degree murder during a drive-by shooting. *See* Minn.Stat. § 609.185(a)(3). After in-

ments of the various attempted murder charges, the court defined "attempt." The court stated:

> The statutes of Minnesota provide that a person is guilty of an attempt to commit a crime when, with intent to commit the crime, the person does an act that is a substantial step toward, and more than mere preparation for, the commission of the crime.
>
> An attempt to commit a crime requires both an intent to commit the crime and a substantial step toward commission of the crime.

Then, in reciting the elements of the attempted murder charges, the court stated that the jury must find that "the Defendant intended to commit the crime of *attempted* murder drive-by."[4] (Emphasis added.) The court went on to say:

> The statutes of Minnesota provide that whoever, while committing or attempting to commit the crime of drive-by shooting, causes the death of a human being with intent to effect the death of that person or another is guilty of a crime.
>
> Second, the Defendant did an act that was a substantial step toward, and more than mere preparation for, the commission of that crime.

We examine whether the attempted murder instructions, after being reviewed as a whole, materially misstate the law and were therefore erroneous. *See Pendleton*, 725 N.W.2d at 730. A defendant is guilty of attempted murder if he or she, "with intent to commit [murder], does an act which is a substantial step toward ... the commission of [murder]." Minn.Stat. § 609.17, subd. 1 (2008). Under this statute, the district court improperly instructed the jury as to the element of intent in the specified attempted murder crimes. But when reading the jury instructions as a whole, we cannot characterize the instructions as a material misstatement of the law. Before reading the instructions on the attempt counts, the court correctly defined attempt as requiring "an intent to commit the crime, and a substantial step toward the commission of the crime." When defining the elements of the attempted murder crimes, the court correctly stated that the murder statutes require the defendant to intend to cause the death of a person, and the defendant to take a substantial step toward committing that crime.

Finally, the record reflects that defense counsel worked for an hour with the State and two hours with the State and the district court on the jury instructions. Defense counsel made no objection on the record to the jury instructions, which further demonstrates that the incorrect lan-

---

structing the jury on the elements of first-degree murder, the court went through the elements of drive-by shooting, which require only the reckless discharge of a firearm. *See* Minn.Stat. § 609.66, subd. 1(e) (2008). Cruz argues this allowed the jury to find him guilty of first-degree murder without finding intent. If the instruction is read as a whole, however, it is clear that intent to kill must be present in order to find Cruz guilty of first-degree murder during a drive-by shooting. The instruction did not minimize the burden of first-degree murder—it only stated the requisite intent for the drive-by shooting element of that offense.

4. For ease of reading, we have only set forth the district court's jury instruction on the charged crime of attempted first-degree murder during a drive-by shooting. Substantially similar instructions were given for two other charged attempt crimes: attempted first-degree murder during a drive-by shooting for the benefit of a gang and attempted second-degree intentional murder for the benefit of a gang. The court's instructions for attempted second-degree intentional murder correctly stated that Cruz must have intended to commit second-degree murder.

guage did not rise to the level of a "material misstatement." Because we conclude there is no error in either the transferred intent instructions or the attempted murder instructions, we do not reach the next steps in the plain error analysis.

## III.

■ Cruz's next claim is that there was insufficient evidence to prove the element of intent to kill, an element required for each of the 18 guilty verdicts. Cruz also claims that there is insufficient evidence of premeditation to support the first-degree murder verdicts. Cruz argues that the circumstantial evidence is just as consistent with the hypothesis that Cruz did not intend to kill and was merely shooting at trespassers in an attempt to scare or injure them.

■ When reviewing a question on the sufficiency of the evidence, "we view the evidence in the light most favorable to the verdict and assume that the fact finder rejected any evidence inconsistent with the verdict." *State v. Pendleton,* 759 N.W.2d 900, 909 (Minn.2009). The verdict will not be overturned if the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt. *State v. Hughes,* 749 N.W.2d 307, 312 (Minn.2008). Circumstantial evidence is entitled to the same weight as direct evidence and will permit a conclusion that evidence was sufficient if a detailed review of evidence and reasonable inferences drawn from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of guilt. *See State v. Whittaker,* 568 N.W.2d 440, 452–53 (Minn.1997).

■ Minnesota Statutes § 609.185 defines first-degree murder as an intentional killing committed with premeditation or in the course of committing a drive-by shoot-ing. Intent is defined as when a person has a "purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4) (2008). Intent may be inferred from the manner of the killing. *Hall,* 722 N.W.2d at 477; *see State v. Harris,* 405 N.W.2d 224, 229 (Minn.1987) (concluding that intent to kill was proven when defendant shot victim in the head from three or four feet away with a shotgun).

■ Premeditation is a state of mind generally proved circumstantially by drawing inferences from a defendant's words and actions in light of the totality of the circumstances. *Holliday,* 745 N.W.2d at 563. Premeditation can be inferred if there is: (1) planning activity shown by the defendant's actions prior to the actual killing; (2) motive inferred from the defendant's prior relationship with the victim; or (3) evidence as to the nature of the killing from which it can be inferred that the killing was premeditated. *See State v. McArthur,* 730 N.W.2d 44, 49–50 (Minn. 2007); *State v. Kendell,* 723 N.W.2d 597, 606–07 (Minn.2006) (concluding that "the nature of the killing [evidence was] significant" where the defendant (1) fired multiple shots; (2) shot the victim in the head at close range; and (3) fled the scene following the shooting). Motive can be inferred by the defendant's prior relationship and conduct with the victim. *Kendell,* 723 N.W.2d at 607.

There was sufficient evidence in this case for the jury to conclude that Cruz premeditated and intended to kill Hernandez Leon and the other shooting victims. The evidence showed that Cruz left a car carrying a semiautomatic weapon. Cruz asked people what gang they were from and then started shooting even though no one in the group made a statement or

gesture. Cruz shot at a small group of people less than 10 feet away from him, and he continued to shoot even as victims fell to the ground. Cruz then fled the scene of the shooting. Premeditation is furthered proven by evidence that Cruz and the victims belonged to rival gangs that were concerned with geographical dominion and that the shooting happened within the claimed area of Cruz's gang. Viewing the evidence in the light most favorable to the verdict, we conclude there was sufficient evidence to support that Cruz acted with premeditation and the intent to kill.

## IV.

■ Cruz next claims that the district court erred by entering convictions against Cruz on all 18 guilty verdicts. Cruz was given four sentences, one for each victim. Cruz asks that his unsentenced convictions be vacated pursuant to Minn.Stat. § 609.04 (2008). The State does not object to vacating the convictions, but asks us to note that the underlying guilty verdicts remain in force.

Minnesota Statutes § 609.04 states that a defendant may be convicted "of either the crime charged or an included offense, but not both." Included offenses include "[a] lesser degree of the same crime" or "[a] crime necessarily proved if the crime charged were proved." Minn.Stat. § 609.04, subd. 1(1), (4). We have vacated convictions where there are multiple murder convictions from a single criminal act, even if the crime satisfies more than one definition of first-degree murder. *State v. Johnson*, 616 N.W.2d 720, 730 (Minn.2000). We have also stated that for a crime committed "for the benefit of a gang," the underlying crime is an included crime. *Lopez–Rios*, 669 N.W.2d at 615.

Because the State does not object to vacating the unsentenced convictions, it is

not necessary for us to answer definitively whether each of Cruz's convictions is an included offense. It is sufficient to vacate the unsentenced convictions and recognize, as we did in *State v. Earl*, that "the jury verdicts on [the vacated] counts remain in force." 702 N.W.2d 711, 724 (Minn.2005).

## V.

By pro se supplemental brief, Cruz makes five additional arguments. One argument is that Cruz's convictions should be vacated because they are based solely on circumstantial evidence, as there is no physical evidence connecting him to the crimes. This is essentially an argument of insufficient evidence to support Cruz's convictions, an argument that we have already addressed. We address Cruz's other arguments, which assert that the district court committed reversible error by allowing evidence from the photo lineups, unnecessarily repeated instructions to the jury on media coverage, and sentenced Cruz improperly on more than one count. Cruz also argues that prosecutorial misconduct was committed.

*Admission of Photograph and Lineup Evidence*

Cruz first argues that the district court committed reversible error by admitting a prejudicial photograph and evidence from tainted, suggestive photo lineups. The district court allowed a photograph of Cruz at a party where he and others had been handcuffed; it appears from the record that when the photos were published to the jury, the pictures were cropped so no handcuffs were visible. We first consider whether the admission of the photograph was an abuse of discretion because it was unduly prejudicial. *See State v. Hurd*, 763 N.W.2d 17, 29–30 (Minn.2009). The photograph was part of a set of photographs that the State was using to establish that Cruz associated with people connected to the Surenos 13. It appears that these

photographs were edited to remove the prejudicial connection to a previous arrest.

 The district court also allowed identification evidence based on the two photo lineups prepared the night of the shootings. In one of the lineups, Cruz was wearing a denim-type light blue shirt, with three men in black shirts, one in white, and one in an orange jumpsuit. The other lineup had Cruz in the same blue shirt and includes two others in blue shirts. When determining whether a photographic line-up was unnecessarily suggestive, we inquire "whether the procedure used by the police influenced the witness identification of the defendant." *State v. Young,* 710 N.W.2d 272, 282 (Minn.2006) (internal quotation marks omitted). The key factor in deciding if such an identification procedure was unnecessarily suggestive is whether the defendant was "unfairly singled out for identification." *Id.* If the procedure was unnecessarily suggestive, it is still not error if "the totality of the circumstances establishes that the evidence was reliable." *Id.* (internal quotation marks omitted).

 The only photo lineup that arguably singles out Cruz is the one where Cruz is the only person wearing a blue shirt. However, several witnesses did not make an identification from that lineup, and the witnesses who did were those closest to the shooting when it happened. The lineup was shown to most of the witnesses the night of the shooting, and their identifications are supported by those who knew Cruz personally and testified that he was the shooter. We conclude that the identification procedure did not unfairly single Cruz out for identification and therefore it was not an abuse of discretion for the court to admit the evidence.

*Instructions on Media Coverage to the Jury*

 Cruz also argues that the district court erred by repeatedly instructing the jury to refrain from watching media coverage on his case. Media attention first began when Cruz fled to Illinois before he was arrested for these crimes. A local television news program did a feature on Cruz's arrest and extradition back to Minnesota. Cruz moved to bar the State from making reference to Cruz's extradition because of its potential to remind the jurors of the news story. The court denied the motion, but offered to warn the jury about media coverage. The court warned the jury to avoid media coverage of the case approximately three times, usually before the jury was released for the day. The court also made a general statement one morning after it had received some inquiries from the news media. The State and defense counsel together asked the court to refrain from further statements about half-way through the trial because there was ongoing media coverage. The court agreed and did not again address the issue with the jury.

Whether to provide cautionary instructions is in the district court's discretion, and we will only review that decision for an abuse of that discretion. *See State v. Roman Nose,* 667 N.W.2d 386, 397–98 (Minn.2003). There was no abuse of discretion here because Cruz had raised concerns about media coverage before trial, which prompted the court to offer to issue instructions. The instructions were usually at the end of the day and limited in content. Most importantly, instructions were only made three or four times, and the court stopped giving such instructions as soon as requested.

*Cruz's Multiple Sentences*

 Cruz next argues that his sentence was illegal because he was sentenced based on four different crimes that arose out of the same behavioral incident. Generally, an individual's conduct that consti-

tutes more than one crime can result in a punishment for only one of the offenses. Minn.Stat. § 609.035 (2008). However, when multiple victims are involved, multiple and consecutive sentences are allowed. *State v. Richardson*, 670 N.W.2d 267, 284 (Minn.2003). As long as the multiple sentences do not unfairly exaggerate the criminality of the conduct, one sentence may be imposed for each victim. *State v. Whittaker*, 568 N.W.2d 440, 453 (Minn.1997). As our standard of review is abuse of discretion, and we have upheld similar sentences before, *see id.*, we conclude that the district court did not err in giving Cruz multiple sentences for multiple victims.

*Prosecutorial Misconduct*

■ Cruz next argues that the prosecutor committed prosecutorial misconduct in his opening statement. In that statement, the prosecutor stated: "In August of 2007, witnesses will tell you that the Defendant was an active member of a street gang in Minneapolis called the Surenos 13." Cruz did not object to the statement at trial, and thus waived the grounds for us to review it now. *State v. Budreau*, 641 N.W.2d 919, 928 (Minn.2002). But even if we do consider Cruz's prosecutorial misconduct claim on the merits, we will only reverse if "the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial." *State v. Wright*, 719 N.W.2d 910, 918 (Minn. 2006). The prosecutor limited his statement to telling the jury that witnesses would testify to such a fact, and two witnesses did testify that Cruz was a member of the Surenos 13. This statement did not impair Cruz's right to a fair trial and does not warrant reversal.

Affirmed as modified.