STATE of Minnesota, Respondent,

v.

Timothy Ayman BAKDASH, Appellant.

No. A12–1133.

Court of Appeals of Minnesota.

May 20, 2013.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for respondent.

Joseph P. Tamburino, Hillary B. Hujanen, Caplan & Tamburino Law Firm, P.A., Minneapolis, MN, for appellant.

Considered and decided by HOOTEN, Presiding Judge; CLEARY, Judge; and SMITH, Judge.

## OPINION

HOOTEN, Judge.

Appellant challenges his convictions of second-degree murder and attempted second-degree murder, arguing that the district court erroneously included the doctrine of transferred intent in the jury instructions, he was denied due process because the indictment was constructively amended when the doctrine of transferred intent was advanced as a theory at trial but not before the grand jury, and the district court erroneously refused to order disclosure of the full grand jury transcript. We affirm.

## FACTS

On April 25, 2011, appellant Timothy Ayman Bakdash was charged with one count of second-degree murder in violation of Minn.Stat. § 609.19, subd. 1(1) (2010), for the death of B.V.H. and two counts of second-degree assault in violation of Minn. Stat. § 609.222, subds. 1, 2 (2010) for injuries sustained by S.B. and K.H. On May 19, 2011, appellant was indicted by a grand jury for one count of first-degree murder

in violation of Minn.Stat. § 609.185(a)(1) (2010) for the death of B.V.H., and two counts of attempted first-degree murder relative to the injuries sustained by S.B. and K.H. The state advanced twelve charges at trial: (1) first-degree murder for the death of B.V.H.; (2) second-degree murder for the death of B.V.H.; (3) second-degree felony murder for the death of B.V.H.; (4) criminal vehicular homicide for the death of B.V.H.; (5) attempted first-degree murder as to S.B.; (6) attempted second-degree murder as to S.B.; (7) second-degree assault as to S.B.; (8) criminal vehicular operation as to S.B.; (9) attempted first-degree murder as to K.H.; (10) attempted second-degree murder as to K.H.; (11) second-degree assault as to K.H.; and (12) criminal vehicular operation as to K.H.

**Victim and Witness Testimony**

In the early morning of April 15, 2011, just before 2:00 a.m., B.V.H. was with friends in the Dinkytown neighborhood of Minneapolis near the Library Bar, located on the corner of 4th Street Southeast and 13th Avenue Southeast in Minneapolis. At the time, the sidewalks were crowded, primarily with college-aged students leaving area bars. B.V.H. and a friend, L.F., were walking north on 14th Avenue and turned left, along with approximately ten other people, onto the north sidewalk of 5th Street. On this block, 5th Street is a one-way street with only east-bound traffic.

L.F. heard the sound of an accelerating vehicle from behind. She did not hear anyone fighting or yelling, and she did not hear any horn, brakes, or squealing tires. She turned around and saw a vehicle driving towards the group and stepped onto a dirt patch by the sidewalk to avoid being hit. L.F. attempted to grab B.V.H.'s arm, but the vehicle's hood hit B.V.H. and carried him forward on the windshield. The vehicle appeared to accelerate, and B.V.H. remained on the vehicle until the corner of 12th Avenue and 5th Street, at which point he "flew off the hood of the car and hit the telephone pole on the corner and then landed in the street." B.V.H. later died because of blunt force injuries to his brain.

S.B. and K.H., along with their friend J.B., were also walking on the sidewalk north of 5th Street. S.B. was closest to the street, alongside K.H., and heard a vehicle accelerate behind her. K.H. turned towards her, and the next thing she recalled was "waking up on the ground halfway between the boulevard and the sidewalk." S.B. sustained injuries and was hospitalized. K.H. remembered hearing a vehicle accelerate behind her. She turned to her left, but did not remember anything else until she regained consciousness and woke up on the sidewalk. K.H. also sustained injuries, though not to the extent of S.B.'s injuries. J.B. testified that he did not see the vehicle collide with S.B. and K.H., but heard a vehicle and then fell to the ground seconds later. He saw the vehicle drive back onto the street and away from the scene without slowing down.

A.E. and his friends were also at the location of the incident when he "heard a car coming the wrong way down a one-way." He "saw some headlights" and then "turned around and there was a car pulling onto the curb." "[A] few seconds" later, the vehicle made contact with his foot and he ran into the street to avoid the vehicle. He then observed the vehicle accelerate, heard screams, and eventually saw the vehicle collide with a person before driving away. He did not see the driver. A.E. spoke with police the next day and denied having any prior association with appellant.

Two of A.E.'s friends provided substantially similar testimony. One friend recalled that the vehicle "didn't look like it was slowing down, so [he] yelled something and ... ran up a grassy hill" as the

vehicle turned and drove down the sidewalk. He described it as "taking a sharp right hand turn and ... going like kind of fast" without slowing down. He recalled that the vehicle's speed increased as it drove towards him down the sidewalk, though he did not see it contact A.E. Another friend explained that as they were walking down 5th Street, he heard a scream or a yell, turned toward the scream and saw headlights approach from 20 or 30 feet away at approximately 30 miles per hour. He was able to avoid the vehicle by running run up an embankment, but saw the vehicle hit three people at a point about 10 to 15 feet from where he was standing.

M.D. testified that, on the night of the incident, he accompanied appellant to the Library bar where they each consumed at least nine drinks. Over the course of four and one-half hours, M.D. noticed that appellant became increasingly aggressive by making "karate chops at the bar, but not necessarily towards anybody." Appellant did not appear angry with anyone and did not appear excessively intoxicated. When they left the bar around 2:00 a.m., M.D. suggested that they hire a taxi, but appellant refused, stating that he had to work that morning and needed his vehicle. As they walked towards appellant's vehicle, two males, whom they did not know, approached them and asked if they wanted to fight. M.D. had no interest in fighting, but recalled that appellant wanted to fight and appeared angry. Rather than fighting, he and appellant entered appellant's vehicle, and the two males walked away. Appellant declared that they should have fought.

M.D. testified that appellant turned right out of the lot onto 5th Street, driving west at 30 to 50 miles per hour, and saw the same two males walking "a little bit off the sidewalk." Appellant accelerated "pretty much right away" and drove to-wards the two males despite M.D.'s objections. M.D. testified that the vehicle struck a female and believed that she was carried on the hood, and then collided with a second person. As appellant drove back onto 5th Street, he avoided hitting a tree. Appellant yelled, "They deserved it!"

**Appellant's Testimony**

Appellant remembered the course of events differently. He testified that he picked up M.D. in his vehicle, smoked marijuana, and drove to the Library Bar. Appellant drank "between fifteen to twenty drinks and probably about three to five shots." By the time they left at around 1:50 or 2:00 a.m., appellant was "extremely intoxicated" and "kind of in and out of reality." Appellant explained that he and M.D. encountered a male, later identified by appellant as A.E., in a blue shirt yelling at them as they walked towards appellant's vehicle. After M.D. entered the vehicle, this person lightly slapped appellant on both sides of his face. Appellant said that he did not want to fight, entered his vehicle, and rejected M.D.'s suggestion to get a taxi. He testified that he was not thinking straight and that his "brain was in a fog from the chemicals and alcohol."

Appellant exited the parking lot and drove the wrong way down 5th Street. He saw the male in the blue shirt and said "There's the guy!" M.D. responded, "Hit him!" Appellant drove onto the curb, "really slow[ly]," "at the guy in the blue shirt, intending to scare him, not intending to hit him." Appellant estimated that he was going "about fifteen miles an hour" and testified that his car clipped A.E.'s foot and hit a female. He explained that the female was "all of a sudden ... there," and that it "happened so quick" "like one, two, three." He panicked, "wanted to flee the scene" by speeding "up a little bit" while driving on the curb, even though the passenger's side of the windshield was "shattered out" and he had "basically no

visibility." He returned to the street "real[ly] quick[ly]." Appellant did not see the third or fourth victims and did not know that he had hit them, but acknowledged that he heard noises which he described as sounding "like something swiped the side of my car." After driving back onto the street, he accelerated and left the scene.

The jury found appellant not guilty of the counts of first-degree murder and attempted first-degree murder, but returned verdicts of guilt on the remaining charges. He received concurrent sentences of 173 months for attempted second-degree murder relative to S.B. and K.H., and 307 months for second-degree murder for the death of B.V.H., to be served consecutively with his 173–month sentence. This appeal follows.

## ISSUES

I. **Did the district court err by including the statutory language incorporating the doctrine of transferred intent in the jury instructions defining the murder and attempted murder charges?**

II. **Was the indictment constructively amended when the doctrine of transferred intent was advanced as a theory at trial but not before the grand jury?**

III. **Did the district court err by denying appellant's motion for full disclosure of the grand jury transcripts?**

## ANALYSIS

I. **Did the district court err by including the statutory language incorporating the doctrine of transferred intent in the jury instructions defining the murder and attempted murder charges?**

Appellant argues that the district court erred by including the doctrine of transferred intent in its jury instructions on the murder and attempted murder charges. "The decision to give a requested jury instruction lies in the discretion of the trial court and will not be reversed absent an abuse of that discretion." *State v. Palubicki,* 700 N.W.2d 476, 487 (Minn. 2005). We review jury instructions "in their entirety to determine whether they fairly and adequately explain the law." *State v. Cruz–Ramirez,* 771 N.W.2d 497, 507 (Minn.2009).

"[A] specific-intent crime requires an intent to cause a particular result." *State v. Fleck,* 810 N.W.2d 303, 308 (Minn.2012) (quotation omitted). First and second-degree murder and attempted first and second-degree murder are specific-intent crimes. *See State v. Young,* 710 N.W.2d 272, 278 (Minn.2006) (stating that Minn.Stat. § 609.19, subd. 1(1), requires proof that one "either had a purpose to kill [the victim] or believed that his actions, if successful, would kill"); *State v. Moore,* 458 N.W.2d 90, 94 (Minn.1990) ("First degree murder, like an attempted crime, is a specific intent crime."). In order to convict appellant of first and second-degree murder, the state must prove that he intended to effect the death of a person or "another." Minn. Stat § 609.185(a)(1) (first-degree murder); Minn.Stat. § 609.19, subd. (1)(1) (second-degree murder). The "or another" phrase incorporates the doctrine of transferred intent. *See State v. Sutherlin,* 396 N.W.2d 238, 240 (Minn.1986) (explaining that language of Minn.Stat. § 609.185 incorporates the doctrine of transferred intent). Transferred intent "is the principle that a defendant may be convicted if it is proved he intended to injure one person but actually harmed another." *State v. Hall,* 722 N.W.2d 472, 477 (Minn.2006) (quoting

McCarr & Nordby, *Minnesota Practice* § 44.8 (3d ed.2001)). "This is because the public policy goal of transferred intent is to hold the actor culpable for his intended actions." *Id.*

Appellant argues that the doctrine of transferred intent does not apply to crimes against unintended victims that are different or of a more serious nature than crimes committed against an intended victim. Appellant asserts that he only intended to inflict fear of bodily harm in A.E. and did not intend to harm him or anyone else. He argues that his intent to assault A.E. cannot transfer to B.V.H., S.B., and K.H. as unintended victims of first or second-degree murder or attempted first or second-degree murder.

Appellant relies on *State v. Merrill*, 450 N.W.2d 318 (Minn.1990), in support of this contention. In *Merrill*, the supreme court explained that "the doctrine of transferred intent applies when the intent being transferred is for the same type of harm. If the harms are different, intent is not transferable." 450 N.W.2d at 323. The supreme court stated, for example, that "an intent to murder cannot substitute for the intent required to convict for the malicious destruction of property that may have inadvertently been damaged during the murderous assault." *Id.* However, *Merrill* concludes that transferred intent applied to charges of first and second-degree murder of an unborn child who died as a result of a defendant's act of murdering the unborn child's mother, reasoning that the harm intended towards the mother was "substantially similar" to the harm suffered by the unborn child. *Id.* Thus, the applicability of transferred intent depends upon whether the intended harm is different or substantially similar to the unintended harm.

In support of his claim that the doctrine of transferred intent does not apply to the attempted second-degree murder charges relative to S.B. and K.H., appellant cites *State v. Noble*, a case in which a defendant was charged with attempted second-degree murder of a mother who was one month pregnant with his child. 669 N.W.2d 915, 917–18 (Minn.App.2003), *review denied* (Minn. Dec. 23, 2003). The state also brought charges for attempted second-degree murder of her unborn child. *Id.* at 918. Although we noted that "[i]t is questionable whether the doctrine of transferred intent applies to attempted murder," we nonetheless upheld the conviction for attempted second-degree murder of the unborn child on other grounds, and noted that the "conviction [did] not rest on an application of the doctrine of transferred intent." *Id.* at 919. *Noble* is not dispositive given its unique facts.

Contrary to appellant's contention, Minnesota caselaw has consistently applied the doctrine of transferred intent to specific-intent crimes. In *State v. Holliday*, the defendant shot an innocent bystander while chasing and shooting in the direction of another person. 745 N.W.2d 556, 560 (Minn.2008). The supreme court noted that "[p]remeditation will transfer with intent if the perpetrator premeditated the murder of an intended victim but accidentally killed an unintended victim." *Id.* at 562 (quoting *Hall*, 722 N.W.2d at 477). In applying the doctrine of transferred intent, the supreme court affirmed convictions for the first-degree murder of the bystander and the attempted first-degree murder of the intended victim. *Id.* at 564. In *State v. Ford*, the defendant was convicted of first-degree murder and attempted first-degree murder for killing a police officer and wounding a bystander. 539 N.W.2d 214, 217 (Minn.1995). The supreme court upheld the convictions, citing *Merrill*, concluding that the attempted murder convic-

tion "involve[d] the doctrine of transferred intent." *Id.* at 229.

The supreme court in *Cruz–Ramirez* applied the doctrine of transferred intent to first and second-degree murder charges for the death of a man in a vehicle and attempted first and second-degree murder charges for three other men in close proximity to the vehicle in a gang-related shooting with a semiautomatic weapon. 771 N.W.2d at 500–03, 506–07. On appeal, appellant argued that transferred intent did not apply because there was no evidence "that any of the victims were accidental, unintended victims." *Id.* at 507. The supreme court rejected the appellant's argument, explaining that "transferred intent allows evidence of an intent to harm someone to transfer to the person actually harmed when there is a possibility the victim was not the intended recipient of the specific act." *Id.* (quotation omitted). Noting that the appellant "shot a semiautomatic weapon multiple times toward several people in close proximity," the supreme court concluded that "[t]he evidence, while showing intent to kill and premeditation, [did] not unerringly show that each fired bullet was intended for the person that it hit." *Id.*

We applied the same rationale in *State v. Livingston,* in which the defendant ordered his pit bull to attack an individual in a parking lot, and during the course of the attack the dog bit other nearby individuals. 420 N.W.2d 223, 225–26 (Minn.App.1988). Appellant argued that the transferred intent instruction did not apply because the dog bit the intended victim, requiring the state to further prove intent to assault the additional victims. *Id.* at 229. Rejecting this argument, we held that the doctrine of transferred intent "allow[ed] the state to prove only that [the defendant] intended to harm [the initial victim]; the law considers him to have also intended to harm [the additional victims]." *Id.* We stressed that "the jury was instructed that actual assaults on each individual had to be proven by the state," and commented that construing the doctrine of transferred intent to result in a mandatory presumption of intent in all cases "would allow one who threw a bomb into a crowd of people to escape criminal liability for harm to injured persons except one when he can persuade a factfinder that he only intended to harm one particular person." *Id.* at 230. We further observed that "[t]he same would hold true for any dangerous instrumentality which, by its nature, causes harm to more than one person." *Id.*

In light of this caselaw, we reject appellant's argument that the doctrine of transferred intent does not apply in the instant case. It is clear from the verdict that the jury rejected appellant's claim that he merely intended to scare A.E. By intentionally driving his vehicle onto a sidewalk into a group of pedestrians, appellant used his vehicle as a dangerous weapon. *See State v. Klaus,* 730 S.W.2d 571, 575 (Mo.Ct.App.1987) ("The use of a deadly weapon, [including a car in this case], in such a manner that a vital part of the victim's body is likely to be injured is sufficient to permit a finding of intent to kill"). Viewing the evidence in a light most favorable to the jury's verdict, *State v. Pendleton,* 759 N.W.2d 900, 909 (Minn. 2009), there is substantial evidence that appellant intended to cause the death of a person, particularly here where appellant indicated that his actions were done in response to M.D.'s directive to "hit him."

Consistent with *Holliday, Ford, Cruz–Ramirez,* and *Livingston,* appellant's intent to hit someone with his vehicle is transferred to unintended victims who were hit and either injured or killed. Because the entire incident took only a few

seconds and involved the use of appellant's vehicle as a dangerous weapon in one uninterrupted and continuous act, there is no merit to appellant's argument that B.V.H.'s death was too remote from appellant's initial attempt to hit his intended victim. *See, e.g., State v. Rodriguez–Gonzales,* 164 Ariz. 1, 790 P.2d 287, 289 (Ct. App.1990) ("The act of shooting did not end when the first bullet found its intended target, but rather when the final victim was hit.").

■■■■ We also disagree with appellant's contention that there can be no transferred intent from the attempted murder of a specific victim. "An attempt requires that the actor have specific intent to perform acts and attain a result which if accomplished would constitute the crime alleged." *Noble,* 669 N.W.2d at 919; *see also* Minn.Stat. § 609.17, subd. 1 (2010) ("Whoever, with intent to commit a crime, does an act which is a substantial step toward, and more than preparation for, the commission of the crime is guilty of an attempt to commit that crime. . . ."). Without citing any controlling Minnesota law, appellant argues that transferred intent does not apply because he was never charged with an attempted murder of an intended victim, and even if he had been so charged, his intent could not transfer because his intent ended with the completion of his attempt. However, as set forth in *Cruz–Ramirez,* it is not necessary for the state to specifically establish an intended victim so long as there is proof of a defendant's intent to cause the death of a person. Accordingly, in this case, the state's failure to advance charges relative to the attempted murder or assault of A.E. is not fatal to the application of the doctrine of transferred intent where intent to cause the death of a person is otherwise proved. In light of evidence that appellant intended to cause the death of a person, the district

court did not abuse its discretion by including the statutory language implicating transferred intent in the jury instructions.

**II. Was the indictment constructively amended when the doctrine of transferred intent was advanced as a theory at trial but not before the grand jury?**

■■■■ Appellant next argues that he was denied due process because the theory of transferred intent was submitted to the jury in a manner constituting improper constructive amendment of the indictment. He asserts that it was "likely" that the grand jury found that he "had direct intent" towards S.B., K.H., and B.V.H., and that the theory of transferred intent was not argued before the grand jury. "The charges upon which the state may proceed at trial must be included within the indictment, complaint or tab charge." *State v. Gisege,* 561 N.W.2d 152, 156 (Minn.1997) (quotation omitted). "Minn. R.Crim. P. 17.05 provides that the [district] court may permit amendment of an indictment at any time before the verdict if no additional or different offense is charged and the substantial rights of the defendant are not prejudiced." *State v. Lory,* 559 N.W.2d 425, 428 (Minn.App.1997) (quotation omitted), *review denied* (Minn. Apr. 15, 1997). "Generally, an amendment to an indictment made either before or after trial, must be of form, not of substance, which means the amendment may not charge a greater offense." *State v. Pettee,* 538 N.W.2d 126, 131 (Minn.1995). "An amendment of an indictment occurs when the state or the court alters the charging terms of the indictment after the grand jury has finally passed on them." *Id.* But "when the record demonstrates that a defendant is confronted with an additional charge after trial has begun, such charge constitutes a constructive amendment. . . ." *State v. Guerra,* 562 N.W.2d 10,

13 (Minn.App.1997) (applying Minn. R.Crim. P. 17.05 to constructive amendment of a complaint). Allowing amendment under Minn. R.Crim. P. 17.05 "is in the sound discretion of the trial judge." *Gerdes v. State,* 319 N.W.2d 710, 712 (Minn.1982).

■■■■ Appellant asserts that at the time the grand jury was convened, the state was aware that A.E. was the first person struck by appellant's vehicle. He also notes that A.E. did not testify before the grand jury, that the grand jury did not know of A.E.'s existence, and that "there was sufficient evidence at the close of the [grand jury] proceedings to charge [a]ppellant with attempted murder as to two victims, and first[-]degree murder as to the third, using a theory of direct intent." According to appellant, the essential elements of the crimes were modified upon presentation of the theory of transferred intent to the jury. However, appellant cites no authority supporting the proposition that variance of the particular theory behind criminal charges, such as transferred intent, constitutes an impermissible constructive amendment in violation of Minn. R.Crim. P. 17.05. He makes no argument that the state, to the extent that it relied on the theory of transferred intent, advanced additional or different offenses or deprived him of substantial rights.

The state, citing *State v. DeVerney,* 592 N.W.2d 837 (Minn.1999), argues that transferred intent is a theory of culpability that does not constitute a new or additional offense for purposes of requesting an amendment to the indictment or complaint under Minn. R.Crim. P. 17.05. In *DeVerney,* the defendant was charged by indictment with aiding and abetting first-degree murder. 592 N.W.2d at 840. The indictment cited Minn.Stat. § 609.05, subd. 1, which provides that a person is criminally liable for the crime of another if the person intentionally aids or procures the other to commit the crime, but not "the subdivision 2 theory," which provides that a person liable under subdivision 1 is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing the crime intended. *Id.* at 845. The supreme court rejected the argument that instructing the jury on both theories resulted in an impermissible variance, concluding that "[t]he additional instruction did not change the substantive offense; it remained first-degree murder." *Id.* at 846. The aiding-and-abetting aspect of the charge was "not a separate substantive offense and [could] be added at any point prior to a verdict or finding." *Id.* We agree that transferred intent is a "doctrine, derived from the common law, ... that a defendant may be convicted if it is proved he intended to injure one person but actually harmed another." *Hall,* 722 N.W.2d at 477 (quotation omitted).

■■■■ We also agree with the state's contention that appellant was not prejudiced by any reliance on the theory of transferred intent. *See DeVerney,* 592 N.W.2d at 846–47 (concluding that defendant's substantial rights were not prejudiced because he had notice of the state's reliance on section 609.05, subdivision 2, and there was no showing that earlier notice would have altered the defendant's trial strategy). Here, the state sought to establish that appellant intended to cause the death of a person when he drove his vehicle onto the sidewalk. Whether his intended victim was identified or not, appellant was always aware that the doctrine of transferred intent was a potential issue from police reports and grand jury witness testimony. The state also gave appellant express notice that it intended to proceed

on a transferred intent theory in the weeks before the trial. Notwithstanding A.E.'s denial that he had prior contact with appellant, appellant had a full opportunity to present his theory that A.E. was the intended victim, whom he merely intended to scare. Under these circumstances, we reject appellant's claim that the district court abused its discretion by allowing the state to rely upon the theory of transferred intent.

### III. Did the district court err by denying appellant's motion for full disclosure of the grand jury transcripts?

■ Finally, appellant argues that the district court erred by refusing to order disclosure of the full grand jury transcript. The denial of a defendant's request for the entire grand jury transcript will be reviewed for an abuse of discretion. *See Boitnott v. State*, 640 N.W.2d 626, 631 (Minn.2002).

■ In grand jury proceedings, "[a] verbatim record must be made of all statements made, evidence taken, and events occurring before the grand jury except deliberations and voting." Minn. R.Crim. P. 18.04, subd. 1. This record "may be disclosed only to the court or prosecutor unless the court, on the defendant's motion for good cause, . . . orders disclosure of the record or designated portions of it to the defendant or defense counsel." *Id.* "[T]he burden is on the defendant to show good cause for the disclosure of grand jury information." *Boitnott*, 640 N.W.2d at 630. Minn. R.Crim. P. 18.07 further provides:

> Disclosure of matters occurring before the grand jury, other than its deliberations and the vote of any juror, may be made to the prosecutor for use in the performance of the prosecutor's duties, and to the defendant or defense counsel

under Rule 18.04 governing the record of the grand jury proceedings. Otherwise, no one may disclose matters occurring before the grand jury unless directed to do so by the court in connection with a judicial proceeding.

■ Appellant sought the transcript under the "good cause" portion of this rule. Appellant asserts that because there is no Minnesota case discussing when a defendant may be entitled to disclosure of grand jury proceedings under rule 18.07, this rule entitles him to the entire grand jury transcript pursuant to a motion showing good cause. However, the comment to rule 18.04, subdivision 1, provides that "the record may be disclosed to the court or to the prosecutor, and to the defendant for good cause, which would include a 'particularized need.'" The supreme court has adopted the "good cause" requirement to include "a showing of a particularized need." *Boitnott*, 640 N.W.2d at 630–31 (citing *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 222, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979)).

> [T]he United States Supreme Court has defined the term to mean that (a) the material sought is needed to avoid a possible injustice in another judicial proceeding, (b) the need for disclosure is greater than the need for continued secrecy, and (c) the request is structured to cover only the material so needed.

*Id.* at 630–31.

After concluding that the petitioner failed to satisfy his burden of establishing "that he did not previously view the grand jury exhibits he now seeks to review," *Boitnott* required the petitioner to "demonstrate good cause to obtain disclosure of this information" and concluded that "[a] general claim that disclosure of grand jury transcripts will possibly reveal exculpatory evidence is not enough to demonstrate par-

ticularized need."[1] *Id.* at 631. *Boitnott* also cites numerous federal cases applying the particularized need standard to broad, nonspecific requests for exculpatory evidence. *See, e.g., United Kingdom v. United States,* 238 F.3d 1312, 1321 (11th Cir. 2001) ("Appellants' blanket request for *all* of the unused grand jury materials ... cannot be described as the kind of particularized request required for the production of otherwise secret information."); *United States v. Rising,* 867 F.2d 1255, 1260 (10th Cir.1989) ("A general claim that disclosure of Grand Jury transcripts will possibly reveal exculpatory evidence is not enough to demonstrate " 'particularized need' " "); *see also United States v. McDougal,* 559 F.3d 837, 840–41 (8th Cir.2009) (explaining that disclosure of grand jury proceedings requires satisfaction of one of the circumstances set forth in Fed.R.Crim.P. 6(e)(3)(E), as well as a showing of particularized need).

■ With respect to a showing of a particularized need, appellant stresses that "the need for secrecy of the grand jury proceedings is no longer a predominate concern" because the proceedings are over, an indictment was returned, and appellant was already entitled to the transcripts containing witness testimony. He also argues that he should have been permitted to examine the state's instructions to the grand jury regarding each separate definition for the levels of *mens rea* implicated by first-degree murder and attempted first-degree murder as they pertained to the three victims. Appellant explains that he "was unaware of the basis for premeditation, attempt or intent as it relate[d] to each of the three charges" merely from the allegations in the indictment, complaint, and police reports.

■ The state reasonably argues that this constitutes a speculative request that fails to establish particularized need. The mere fact that appellant had no prior encounters or association with the witnesses or victims, aside from the contested facts concerning A.E., does not materially bear on the charges of first-degree and attempted first-degree murder. "Evidence of premeditation generally falls into three categories: planning activity, motive, and nature of the killing." *State v. Palmer,* 803 N.W.2d 727, 734 (Minn.2011). "[F]or the evidence to be sufficient to convict of first-degree premeditated murder, a defendant must have formed the intent to kill, and then must have had some appreciable time in order to consider, plan or prepare for, or determine to commit the killing." *Id.* (quotation omitted). But evidence of motive, such as a defendant's prior relationship with or threats to a victim, is unnecessary to a finding of premeditation. *Palmer,* 803 N.W.2d at 735. Because appellant failed to show good cause or a particularized need for the entire grand jury transcripts, we conclude that the district court did not abuse its discretion by denying appellant's request.

■ More importantly, appellant has failed to establish that he was prejudiced by the district court's refusal to disclose the non-witness portions of the grand jury transcript. "A prejudicial error has been defined as an error which affected the final result of the case and was prejudicial to a substantial right of the party assigning it." *State v. Meemken,* 597 N.W.2d 582, 585 (Minn.App.1999) (quotation omitted), *review denied* (Minn. Sept. 28, 1999). Here,

---

1. We reject appellant's contention that *Boitnott* is inapplicable because it involved a post-conviction proceeding, rather than a pre-trial motion, regarding the grand jury transcripts. We conclude that *Boitnott,* notwithstanding its procedural posture, adopts the good cause definition set forth in the rule's comments and *Douglas* for purposes of pre-trial motions requesting grand jury transcripts. 640 N.W.2d at 630–31.

appellant was acquitted of first-degree and attempted first-degree murder charges brought as a result of grand jury proceedings. Several cases hold that error relating to a particular charge is harmless when a defendant is acquitted of that charge. *See, e.g., State v. Prtine,* 784 N.W.2d 303, 315–16 (Minn.2010) (concluding that any misstatement of evidence during prosecutor's closing argument was harmless because statement was in support of premeditated murder charge, and defendant was acquitted of premeditated murder); *State v. Taylor,* 650 N.W.2d 190, 199 (Minn.2002) (concluding that there was no misconduct when prosecutor spoke to a grand juror about lesser-included offenses because defendant was acquitted on lesser-included charge); *State v. Byman,* 410 N.W.2d 921, 923 (Minn.App.1987) (concluding that defendant was not prejudiced by admission of photos relating to particular charges in light of acquittal on those charges).

### DECISION

The district court did not err by including statutory language implicating the doctrine of transferred intent in the jury instructions addressing appellant's first and second-degree murder and attempted first and second-degree murder charges. Appellant has failed to show that the first-degree murder and attempted first-degree murder charges, which were added as a result of a grand jury indictment, were constructively amended when the state advanced the theory of transferred intent at trial. Finally, the district court did not err by denying appellant's request for disclosure of the entire grand jury transcript given appellant's failure to establish a particularized need for such disclosure.

Affirmed.