HUDSON, Justice.
*897 Appellant Ricky Darnell Waiters shot two customers in a bar parking lot, killing one and wounding the other. He was charged and convicted of several offenses, including first-degree felony murder, attempted first-degree felony murder, and drive-by shooting (the underlying felony). On appeal, Waiters argues that the evidence was insufficient to prove that he discharged a firearm "at or toward" a building or vehicle-a necessary element of drive-by shooting. He also argues that the prosecutor engaged in prosecutorial misconduct when she argued during her rebuttal that Waiters's closing argument was trying to play on the jury's emotions. Finally, Waiters raises three additional arguments in his pro se supplemental brief. We conclude that there is sufficient evidence in the record for a reasonable jury to find that Waiters discharged a firearm "toward" a building, the prosecutor did not commit prosecutorial misconduct, and Waiters's pro se arguments are without merit. Accordingly, we affirm.
FACTS
The facts of this case center on a bar parking lot located in Winona and depicted below:[1]
*898 Six features of the parking lot are relevant here: (1) on the north side of E.B.'s Corner Bar is a door facing the lot; (2) on the western edge of the lot is a house with a privacy fence that separates the house from the parking lot; (3) on the northern edge of the lot is an alley that provides access into the parking lot; (4) on the eastern edge of the lot is a semitrailer that is parked parallel to Ewing Street; (5) an approximately 9-foot gap exists between the front of the semitrailer and the rear wall of the bar; and (6) two covered picnic tables are located near the back door of the bar, which is approximately 18 feet from Ewing Street.
With this scene in mind, we turn to the events of the early morning of July 27, 2016. At approximately 1:00 a.m., Waiters pulled into the parking lot of E.B.'s Corner Bar using the alley entrance on the northern edge of the lot. As Waiters parked his car, two of the bar's customers approached Waiters's vehicle and told him he was parked the wrong way.[2] Waiters then put his car in reverse, pulled back into the alley, and turned right onto Ewing Street. After driving a few yards, Waiters stopped his car at the 9-foot gap between the semitrailer and the bar. According to several eyewitnesses, when Waiters reached the *899 gap, he pulled out a gun, and, sweeping from left to right, fired six shots toward two groups of bar customers. The first group was standing at the back door of the bar and the second group was standing by the picnic tables. Waiters then fled the scene, driving down Ewing Street and then turning east onto West Fifth Street.
Two of Waiters's bullets hit a customer who was standing by the picnic tables; two bullets hit a customer who was standing by the back door of the bar. The former survived, but the latter died. Of the six bullets fired by Waiters, only two were found; one was found in the body of the deceased customer, and the other was found in the driveway of the house on the western edge of the parking lot. Forensic testing, however, showed that, in addition to the bullet found in the driveway, at least one more bullet passed through the privacy fence that separated the house from the parking lot.
Waiters was arrested and ultimately charged with several offenses, including first-degree felony murder, Minn. Stat. § 609.185(a)(3) (2018), attempted first-degree felony murder, Minn. Stat. § 609.17 (2018) ; see Minn. Stat. § 609.185(a)(3), and drive-by shooting, Minn. Stat. § 609.66, subd. 1e (2018). Waiters pleaded not guilty and demanded a jury trial.
At trial, Waiters admitted to shooting the two customers, but claimed he did so in self-defense. More specifically, Waiters claimed that, when he pulled into the parking lot, he saw two customers wrestling in the middle of the lot. Despite their assertions to the contrary, Waiters testified that the two customers did not simply tell him that his car was parked the wrong way. Instead, one of the customers ran over to his vehicle and tried to punch him through the open driver-side window. At that point, Waiters recognized the customer as an acquaintance from work, whom Waiters claimed had previously told Waiters stories about how it was "the neatest thing in the world to be just out of control" and about getting into fights. Waiters backed up out of the parking lot into the alley, but the wrestling customers kept running toward his car. Waiters then turned south onto Ewing Street. Waiters claimed he did not turn north onto Ewing (the direction away from the bar) because he was unfamiliar with the back streets of Winona.
Waiters claimed that he had to stop his car next to the 9-foot gap between the semitrailer and bar because there was another vehicle on the roadway in front of him. Before he could drive away, one of the bar customers stepped out of the gap between the trailer and the bar and stood in front of Waiters's car, holding a knife. According to Waiters, the two wrestling customers also approached Waiters's vehicle. Afraid for his life, Waiters pulled out his gun, loaded it with a clip, and-when the knife-wielding customer tried to leap through the open passenger window-pulled the trigger. Because people were still coming at him, he continued firing. He then fled the scene, driving south down Ewing Street and turning east onto West Fifth Street.
The jury found Waiters guilty of all charges. The district court convicted him of first-degree felony murder and attempted first-degree felony murder. Waiters appeals his convictions.
ANALYSIS
I.
Waiters argues that his convictions must be reversed because the State presented insufficient evidence to prove that he recklessly discharged a firearm at or toward a building-a necessary element of drive-by shooting. Specifically, he contends that because he was aiming at the people standing *900 in the gap between the bar and the trailer, he did not recklessly discharge his firearm at or toward a building . Instead, he simply discharged the firearm near a building. The record does not support Waiters's argument.
When evaluating the sufficiency of the evidence, we "carefully examine the record to determine whether the facts and the legitimate inferences drawn from them would permit the [factfinder] to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." State v. Boldman , 813 N.W.2d 102, 106 (Minn. 2012). "The evidence must be viewed in the light most favorable to the verdict, and it must be assumed that the fact-finder disbelieved any evidence that conflicted with the verdict." State v. Griffin , 887 N.W.2d 257, 263 (Minn. 2016). "The verdict will not be overturned if the fact-finder, upon application of the presumption of innocence and the State's burden of proving an offense beyond a reasonable doubt, could reasonably have found the defendant guilty of the charged offense." Id.
"Whoever ... causes the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit ... a drive-by shooting," is guilty of murder in the first degree. Minn. Stat. § 609.185(a)(3). A drive-by shooting is committed when a person "while in or having just exited from a motor vehicle, recklessly discharges a firearm at or toward another motor vehicle or a building." Minn. Stat. § 609.66, subd. 1e(a). A person recklessly discharges a firearm "when the person consciously disregards a substantial and unjustifiable risk." State v. Vang , 847 N.W.2d 248, 259 (Minn. 2014). Although section 609.66 does not define the word "toward," it is commonly understood to mean "[i]n the direction of." American Heritage Dictionary 1894 (3d ed. 1996).[3]
Reviewing the evidence in the light most favorable to the verdict, we conclude that the evidence and the legitimate inferences drawn from it permitted the jury to reasonably find, beyond a reasonable doubt, that Waiters recklessly discharged a firearm "toward"-or "in the direction of"-a building. At least two of Waiters's six bullets traveled through the privacy fence that separates the house from the parking lot. Although one of these bullets was found north of the house, perforations in the privacy fence, as well as gunshot residue found around those perforations, show that a second bullet was discharged "in the direction of" the house.
Moreover, the fact that neither bullet struck the house is not dispositive. A person can be guilty of drive-by shooting even if they miss; the crime requires only reckless discharge at or toward a building or vehicle. Here, Waiters-who had visited E.B.'s Corner Bar before, and was therefore aware that there was a house on the western edge of the parking lot[4] -discharged a firearm in the direction of the house, disregarding the substantial and unjustifiable risk that one of his bullets would strike the house.
Despite Waiters's assertion to the contrary, the fact that he was purportedly aiming "at" the bar customers does not preclude a finding that he simultaneously discharged the firearm "toward" a building.
*901 [5] We previously considered and rejected this line of argument in Vang .
In Vang , the defendant asserted that "if the evidence presented at his trial prove[d] that he discharged the firearm with an intent to kill [his victims], it cannot also support a finding that he recklessly discharged the firearm at or toward a motor vehicle or building." Vang , 847 N.W.2d at 259. We rejected this argument, concluding that "a person can simultaneously intend to kill someone and recklessly discharge a firearm by firing it in a manner that demonstrates a conscious disregard of a substantial and unjustifiable risk of injury to other people or property." Id. at 259-60. We also noted that although the two mental states are distinct, they are not incompatible: "[t]he recklessness element focuses on the manner in which the defendant discharges the firearm and the intent element focuses on the defendant's desire to kill another." Id. at 260.
Vang compels a similar conclusion in this case. The jury's finding (which Waiters does not contest) that he intended to kill the two customers in this case does not preclude a finding that he also discharged a firearm in a reckless manner "toward" the house on the western edge of the parking lot.
In sum, when viewed in the light most favorable to the verdict, the evidence and the legitimate inferences drawn from it permitted the jury to reasonably find, beyond a reasonable doubt, that Waiters recklessly discharged his firearm "toward" a building, namely the house on the western edge of the parking lot. Consequently, Waiters's sufficiency-of-the-evidence claim fails.[6]
II.
Waiters next argues that he is entitled to a new trial because the prosecutor engaged in prosecutorial misconduct. Specifically, he claims that the prosecutor belittled his defense during her rebuttal when she told the jurors that "[defense counsel's] closing argument to you was filled with emotion, trying to play on your emotions." Waiters did not object to the prosecutor's statement at trial.
"When a defendant alleges unobjected-to prosecutorial misconduct, we apply a modified plain-error standard that requires the defendant to show an error was made that was plain. If the defendant satisfies this burden, the burden shifts to the State to establish that the un-objected to misconduct did not affect substantial rights." Caldwell v. State , 886 N.W.2d 491, 501 n.6 (Minn. 2016). An error is plain if it is "clear or obvious." State v. Sanchez-Sanchez , 879 N.W.2d 324, 330 (Minn. 2016) (quoting State v. Peltier , 874 N.W.2d 792, 799 (Minn. 2016) ). In applying this test, we view the prosecutor's statements "as a whole, rather than just selective phrases or remarks that may be taken out of context or given undue prominence to determine whether reversible error has occurred." State v. Munt , 831 N.W.2d 569, 587 (Minn. 2013) (citation omitted) (internal quotation marks omitted).
*902 "Prosecutors are allowed to argue that there is no merit to the specific defense raised by the defendant, although they may not belittle either the defendant or a particular defense in the abstract." State v. Matthews , 779 N.W.2d 543, 552 (Minn. 2010). Examples of belittlement include challenging a defense in the abstract or suggesting that the defendant is asserting a particular defense because it is the only defense that "might work," State v. Williams , 525 N.W.2d 538, 549 (Minn. 1994). We have also held that belittlement occurred when the prosecutor told the jurors they "would be 'suckers' if they believed the defense." State v. Johnson , 616 N.W.2d 720, 730 (Minn. 2000) (quoting State v. Porter , 526 N.W.2d 359, 365 (Minn. 1995) ).
Waiters contends that the prosecutor effectively told the jury to ignore Waiters's self-defense claim because it was based on an emotional appeal rather than the evidence. We disagree. Immediately after telling the jury that defense counsel's "closing argument to you was filled with emotion, trying to play on your emotions," the prosecutor went on to say, "[W]hat I want to ask you and what you will be instructed about is that you cannot let emotions in on your decisions here. Look at the evidence. The evidence that was presented to you." Considered in context, the prosecutor's statements did not belittle self-defense claims in the abstract. Instead, they reminded the jury of its duty to decide the case based on the evidence, rather than on emotional appeals. These are appropriate arguments, as is pointing out attempts by the defense to distract the jury from the criminal issues at trial. See State v. Simion , 745 N.W.2d 830, 844 (Minn. 2008) ("The prosecutor's comment here was designed to draw the jury's attention to [the defendant's] attempt to distract from the criminal issues at trial. We hold [the defendant] did not meet his burden to show that this argument was error."). Accordingly, we conclude that the State's argument in rebuttal was not prosecutorial misconduct.
III.
Waiters raises three additional arguments in his pro se supplemental brief: (1) the State violated its preservation and discovery obligations; (2) the district court abused its discretion by excluding evidence that one of the State's witnesses made derogatory comments regarding Waiters's race during a police interview; and (3) Waiters received ineffective assistance of trial counsel.
When our careful review of each claim raised in a pro se supplemental brief leads us to the conclusion that the claims are without merit, we have not included a detailed discussion of each claim in our opinion. See , e.g. , State v. Robertson , 884 N.W.2d 864, 877 (Minn. 2016) ("After carefully considering each argument in full, we conclude that [appellant's] pro se claims lack merit."); State v. Davis , 820 N.W.2d 525, 539 (Minn. 2012) ("After carefully reviewing each of these claims, we conclude that they all lack merit and, therefore, we hold that [appellant] is not entitled to a new trial based on the issues raised in his supplemental pro se briefs."). Having carefully reviewed the claims raised in Waiters's pro se supplemental brief, we conclude that they are without merit, and therefore a detailed discussion of each claim is not required.
CONCLUSION
For the foregoing reasons, we affirm Waiters's convictions for first-degree felony murder and attempted first-degree felony murder.
Affirmed.

The diagram entered at trial did not include a compass indicator or the numbered indicators. Based on trial testimony, we have added these references to better orient the reader.

The parking lot is a dirt lot with no marked spots. All of the other vehicles in the lot were parked perpendicular to Ewing Street. Waiters was in the process of parking his vehicle in a parallel orientation when the other customers approached.

The parties do not dispute that this is a correct definition of the term.

Even if Waiters had not previously been to E.B.'s Corner Bar, photographs of the lot taken that night show that the house was visible from where Waiters stopped his vehicle and began shooting.

At oral argument, Waiters appeared to refine this argument, suggesting that because neither the house nor the bar were in line with the trajectory of the bullets, he did not fire "at" or "toward" a building. But this contention is just another way of saying that Waiters was aiming at the bar's customers. It does not negate the fact that he was simultaneously shooting "toward" a building.

Because we conclude that the evidence was sufficient to find that Waiters fired toward the house on the western edge of the parking lot, we do not reach the State's alternative arguments that the evidence was sufficient to find that Waiters fired toward the semitrailer or E.B.'s Corner Bar.