*This opinion is nonprecedential except as provided by
Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-0041**

State of Minnesota,
Respondent,

vs.

Morris Robert Chie Ryan,
Appellant.

**Filed January 12, 2026
Affirmed
Johnson, Judge**

Ramsey County District Court
File No. 62-CR-24-978

Keith Ellison, Attorney General, St. Paul, Minnesota; and

John Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, St. Paul, Minnesota; and

Paul J. Maravigli, Special Assistant Public Defender, Minneapolis, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Johnson, Judge; and Ede, Judge.

**NONPRECEDENTIAL OPINION**

**JOHNSON**, Judge

A Ramsey County jury found Morris Robert Chie Ryan guilty of attempted second-degree intentional murder and other crimes based on evidence that he fired 14 gunshots at the window of an occupied room of a home. We conclude that the evidence is sufficient

to support his convictions, that the prosecutor did not engage in prosecutorial misconduct, and that the erroneous admission of hearsay evidence is a harmless error.  Therefore, we affirm.

**FACTS**

During the evening of December 31, 2023, T.H. was celebrating New Year's Eve at her home in St. Paul with her three children.  Six minutes before midnight, she and her children were in the kitchen, and T.H. was recording a video of herself and her children.  Ten bullets broke through the kitchen window.  T.H.'s 10-year-old son was struck in the abdomen and sustained a life-threatening injury.

A few months before the shooting, the home next door to T.H.'s home had been occupied by L.C., his cousin, and Kelci Meyers.  T.H. had a contentious relationship with L.C., who frequently harassed T.H.'s family and caused damage to T.H.'s home.  After T.H. called police and filed for a harassment restraining order against L.C., Meyers too became hostile toward T.H.  T.H. eventually complained to L.C.'s landlord, and L.C. was evicted.  L.C.'s cousin and Meyers moved out shortly thereafter.  Meyers moved into a house in the city of Hastings, which she shared with Ryan.

The evidence shows that Meyers and Ryan collaborated on the crimes at issue in this case.  Surveillance videorecordings show that, in the late evening of December 31, 2023, Meyers drove Ryan's GMC Yukon while Ryan sat in the front passenger seat.  Approximately ten minutes before midnight, Meyers drove the GMC Yukon past the front of T.H.'s house, which was dark because no lights were on in the front part of the house.  Meyers then made two right turns and drove through the alley behind T.H.'s house.  Lights

were on in the kitchen and the blinds were drawn, but T.H. testified at trial that silhouettes of persons inside the kitchen are visible from outside when the kitchen lights are on. Approximately six minutes before midnight, Meyers drove past the front of T.H.'s home a second time and then drove into the alley behind T.H.'s home for a second time. As the GMC Yukon approached the back of T.H.'s home, it inched forward slowly as Meyers applied the brakes multiple times before stopping, with the passenger side of the GMC Yukon facing the back of T.H.'s house. At 11:54 p.m., Meyers kept her foot on the brakes for 13 seconds while Ryan fired 14 shots at the kitchen window of T.H.'s home. Ten shots entered the house through the kitchen window. In the midst of the shooting, T.H. heard a male voice yell out, "f--- y'all, motherf---ers." When Ryan had finished shooting, Meyers drove away.

The state introduced cell-site-location information showing that both Meyers and Ryan were near T.H.'s home at the time of the shooting and at a nearby gas station shortly after the shooting. Surveillance videorecordings at the gas station show that, at 11:58 p.m. on New Year's Eve, Meyers arrived and exited the driver's seat of the GMC Yukon, which was parked near gas pumps. Meanwhile, Ryan exited from the passenger-side door of the vehicle. Between 11:59 p.m. and 12:07 a.m., Meyers and Ryan were inside the gas station, where they kissed briefly, stood in line, and purchased beverages with Meyers's debit card. Cell-site-location information shows that, between 12:11 and 2:08 a.m., Meyers and Ryan traveled to their home in Hastings. Police officers later found a handgun in the house where Ryan and Meyers lived, and forensic testing showed that the handgun was used in the shooting at T.H.'s house. Both Meyers's and Ryan's DNA were present on the firearm.

3

In a subsequent recorded telephone call while Meyers was in jail, she admitted to her mother that she was driving during the shooting.

The state initially charged Ryan with three offenses. On the eve of trial, the state filed an amended complaint alleging six offenses: (1) attempted second-degree intentional murder, in violation of Minn. Stat. § 609.19, subd. 1(1) (2022); (2) first-degree assault, in violation of Minn. Stat. § 609.221, subd. 1 (2022); (3) drive-by shooting, in violation of Minn. Stat. § 609.66, subd. 1e(a)(2) (2022); and (4)-(6) three counts of second-degree assault, in violation of Minn. Stat. § 609.222, subd. 1 (2022).

The case was tried to a jury on seven days in July 2024. The state called 20 witnesses, including T.H. Ryan did not testify and did not call any other witnesses.

The jury found Ryan guilty on all counts. The district court imposed consecutive prison sentences of 219, 36, 36, and 36 months on counts 1, 4, 5, and 6. The district court did not adjudicate guilt or impose sentences on counts 2 and 3. Ryan appeals.[1]

## DECISION

### I. Sufficiency of the Evidence

Ryan first argues that the state's evidence is insufficient to prove beyond a reasonable doubt the elements of attempted second-degree intentional murder, first-degree assault, and second-degree assault.

---

[1]For her role in the shooting, Meyers was convicted of aiding and abetting attempted second-degree intentional murder, first-degree assault, and drive-by shooting of an occupied building, and was sentenced to 183 months of imprisonment. Her conviction was affirmed by this court on direct appeal. *State v. Meyers*, A24-1471, 2025 WL 3001068 (Minn. App. Oct. 27, 2025), *petition for rev. filed* (Minn. Nov. 26, 2025).

To determine whether evidence is sufficient to support a conviction, this court undertakes "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient." *State v. Jones*, 977 N.W.2d 177, 187 (Minn. 2022) (quotation omitted). We "carefully examine the record to determine whether the facts and the legitimate inferences drawn from them would permit the factfinder to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." *State v. Waiters*, 929 N.W.2d 895, 900 (Minn. 2019) (quotation omitted). "We assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Friese*, 959 N.W.2d 205, 214 (Minn. 2021) (quotation omitted).

If a conviction is based on circumstantial evidence, we apply a heightened standard of review with a two-step analysis. *State v. Petersen*, 910 N.W.2d 1, 6-7 (Minn. 2018); *State v. Moore*, 846 N.W.2d 83, 88 (Minn. 2014). At the first step of the circumstantial-evidence analysis, we "identify the 'circumstances proved.'" *State v. Isaac*, 9 N.W.3d 812, 815 (Minn. 2024) (quoting *State v. McInnis*, 962 N.W.2d 874, 890 (Minn. 2021)). "In identifying the circumstances proved, we assume that the jury resolved any factual disputes in a manner that is consistent with the jury's verdict." *Moore*, 846 N.W.2d at 88. Accordingly, we "disregard evidence that is inconsistent with the jury's verdict." *State v. Harris*, 895 N.W.2d 592, 601 (Minn. 2017). At the second step of the analysis, we "examine independently the reasonableness of the inferences that might be drawn from the circumstances proved," determine whether "the circumstances proved are consistent with guilt," and determine whether the circumstances proved are "inconsistent with any rational

5

hypothesis except that of guilt." *Moore*, 846 N.W.2d at 88 (quotations omitted). At the second step, we do not give deference to the jury's verdict. *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017).

## A. Attempted Second-Degree Intentional Murder

A person is guilty of second-degree intentional murder if the person "causes the death of a human being with intent to effect the death of that person or another, but without premeditation." Minn. Stat. § 609.19, subd. 1(1). A person is guilty of an attempt to commit a crime if the person, "with intent to commit a crime, does an act which is a substantial step toward, and more than preparation for, the commission of the crime." Minn. Stat. § 609.17, subd. 1 (2022).

Ryan argues that the evidence is insufficient to prove that he had the requisite intent when he fired 14 shots at T.H.'s kitchen window. To reiterate, the second-degree-intentional-murder statute requires proof that a defendant acted "with intent to effect the death of that person or another." Minn. Stat. § 609.19, subd. 1(1). The phrase "with intent to" is defined by statute to mean "that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4) (2022).

Ryan contends that the state was required to prove that he intended to kill "a particular person." Ryan's argument appears to be inconsistent with the text of the statute, which requires proof that a defendant had an "intent to effect the death of that person *or another*." Minn. Stat. § 609.19, subd. 1(1) (emphasis added). The doctrine of transferred intent is incorporated into the statute by the use of the phrase "or another." *State v.*

6

*Bakdash*, 830 N.W.2d 906, 912 (Minn. App. 2013) (describing sections 609.185(a)(1) and 609.19, subdivision 1(1)) (quotation omitted), *rev. denied* (Minn. Aug. 6, 2013); *see also State v. Sutherlin*, 396 N.W.2d 238, 240 (Minn. 1986) (describing section 609.185).

Ryan does not cite any caselaw in a second-degree-intentional-murder case requiring proof that a defendant intended to kill a particular person. The supreme court has stated that the doctrine of transferred intent "allows evidence of an intent to harm 'someone' to transfer to the person actually harmed." *State v. Cruz-Ramirez*, 771 N.W.2d 497, 507 (Minn. 2009). This court has stated that "it is not necessary for the state to specifically establish an intended victim so long as there is proof of a defendant's intent to cause the death of a person." *Bakdash*, 830 N.W.2d at 915. Consequently, Ryan overstates the state's burden.

The parties agree that circumstantial evidence is necessary to prove Ryan's intent to effect the death of a person. "Intent is a state of mind, which generally is proved circumstantially, by inference from words and acts of the actor both before and after the incident." *State v. Cruz*, 997 N.W.2d 537, 552 (Minn. 2023) (quotation omitted). Accordingly, we must apply the heightened standard of review applicable to circumstantial evidence.

At the first step of the circumstantial-evidence analysis, we must identify the circumstances proved. *See Moore*, 846 N.W.2d at 88. The circumstances proved relevant to Ryan's intent are as follows. Meyers had an antagonistic relationship with T.H. Meyers and Ryan lived together. Meyers drove Ryan's GMC Yukon past the front of T.H.'s house and then through the alley behind T.H.'s house. The front of the house was dark whereas

7

a light was on in the kitchen, which faced the alley. The kitchen blinds were drawn, but silhouettes are nonetheless visible from outside when the kitchen lights are on at nighttime. T.H.'s son was in the kitchen, near the window. Meyers drove the GMC Yukon past the front of T.H.'s house and into the alley behind T.H.'s house for a second time. As Meyers approached the back of T.H.'s home, she slowly moved the GMC Yukon forward and applied the brakes multiple times. The passenger side of the GMC Yukon faced T.H.'s home. Meyers held the brakes for 13 seconds while Ryan fired 14 shots from the passenger seat. Ten shots entered the house through the kitchen window. A male voice yelled out, "f--- y'all, motherf---ers."

Ryan disputes the state's recitation of the circumstances proved. He contends that there is no evidence that he knew that T.H.'s house or kitchen was occupied because there was "no evidence" that he "could see through the blinds" covering the kitchen window. This contention ignores the evidence that Ryan and Meyers twice drove in front of and in back of T.H.'s house and deliberately selected the location from which Ryan shot at the kitchen window. Ryan's contention also is contrary to T.H.'s testimony that, when the kitchen blinds are drawn at nighttime, a person outside the house can see a silhouette if a person is in the kitchen and the kitchen lights are on. We must "assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary." *Friese*, 959 N.W.2d at 214 (quotation omitted). In addition, T.H.'s testimony is corroborated by exhibit 6, a photograph of the back of T.H.'s house at nighttime with the kitchen lights on and the blinds drawn, which shows that the blinds are translucent (rather than opaque) in that they reveal light and shadows from inside the kitchen, which indicates that a person standing

8

inside the kitchen might appear as a silhouette. Accordingly, Ryan inaccurately states the circumstances proved.

At the second step of the circumstantial-evidence analysis, we continue by determining whether "the circumstances proved are consistent with guilt." *Id.* at 397 (quotations omitted). Ryan contends that it is "mere conjecture" that he was shooting at people rather than shooting at T.H.'s house. The state contends that the circumstances proved support a reasonable inference that Ryan intended to kill one or more persons inside T.H.'s home. Specifically, the state notes that Meyers and Ryan circled the home twice before stopping in the alley at the location from which Ryan shot at the window of the only room of the house with lights on. Ryan fired 14 shots at the kitchen window, 10 of which entered the home through the window. While shooting, a man yelled "f--- y'all, mother---ers." We agree with the state that the circumstances proved allow for a reasonable inference that Ryan intended to kill one or more persons inside the home. Accordingly, the circumstances proved are consistent with the jury's finding of guilt.

At the second step of the circumstantial-evidence analysis, we also must determine whether the circumstances proved are "inconsistent with any rational hypothesis except that of guilt." *Id.* (quotations omitted). Ryan contends that the circumstances proved are consistent with an inference that he intended to shoot only at T.H.'s house, not at a person inside the house. Ryan's asserted hypothesis is inconsistent with multiple circumstances proved. Ryan did not shoot at the house when he and Meyers first drove past the front of the house, which was dark. Instead, Ryan and Meyers drove around the house twice and carefully selected a location from which to shoot. Even then, Ryan did not shoot at the

9

siding on the exterior of the house. Rather, he targeted the kitchen window, which was the only window that revealed interior lighting, and fired 14 shots, 10 of which entered the house through the glass. Ryan shot minutes before midnight on New Year's Eve, when people are more likely to be awake than on other nights of the year. While shooting, Ryan yelled, "F--- y'all, mother---ers," which indicates that he knew or believed that people were inside the home and would hear him. Ryan's hypothesis that he intended to shoot only at T.H.'s house, not at a person, is not a rational hypothesis. Instead, the circumstances proved are "inconsistent with any rational hypothesis except that of guilt." *See id.* (quotations omitted).

Thus, the evidence is sufficient to prove that Ryan is guilty of attempted second-degree intentional murder.

**B.    Second-Degree Assault**

A person is guilty of second-degree assault if the person "assaults another with a dangerous weapon." Minn. Stat. § 609.222, subd. 1. The term "assault" is defined by statute to mean "(1) an act done with intent to cause fear in another of immediate bodily harm or death; or (2) the intentional infliction of or attempt to inflict bodily harm upon another." Minn. Stat. § 609.02, subd. 10 (2022). The district court instructed the jury on the second form of assault (often called assault-harm), which requires proof of either the infliction of harm or an attempt to inflict harm. *See id.* The state's theory at trial was that the three victims associated with the three counts of second-degree assault were T.H. and her two children other than T.S.

10

Ryan contends that the state did not introduce sufficient evidence that he intended to harm a particular person. But assault-harm is a general-intent crime. *State v. Fleck*, 810 N.W.2d 303, 312 (Minn. 2012). Proof of a general-intent crime requires only evidence that "the defendant engaged intentionally in specific, prohibited *conduct*." *In re Welfare of C.R.M.*, 611 N.W.2d 802, 808 n.10 (Minn. 2000). Stated differently, to establish a person's guilt of a general-intent crime, the state need only prove "an intention to make the bodily movement which constitutes the act which the crime requires." *Fleck*, 810 N.W.2d at 308 (quotation omitted). Accordingly, the state did not need to prove that Ryan intended to harm a particular person or any person; the only mental state required was Ryan's intent to fire the handgun. *See id.* at 309; *State v. Dorn*, 887 N.W.2d 826, 831 (Minn. 2016).

The state introduced direct evidence that a person fired a handgun into T.H.'s house through the kitchen window. The only possible remaining issues are the identity of the shooter and whether the shooting was intentional instead of accidental. Because the jury's verdict depends on circumstantial evidence, we apply the heightened standard of review applicable to circumstantial evidence.

At the first step of the circumstantial-evidence analysis, we must identify the circumstances proved. *See Moore*, 846 N.W.2d at 88. The relevant circumstances proved are as follows. Ryan's cell phone was near T.H.'s home at the time of the shooting and near the gas station after the shooting. Meyers admitted to driving Ryan's GMC Yukon during the shooting. During the shooting, Meyers held the breaks on the GMC Yukon for thirteen seconds with the passenger side of the vehicle facing T.H.'s home. Ryan fired fourteen shots. Ten of those shots hit the kitchen window. Shortly after the shooting, Ryan

11

exited the passenger side of the GMC Yukon at the gas station. Forensic testing confirmed that a handgun recovered from Ryan's home was the handgun used in the shooting. Ryan's DNA was on the handgun.

At the second step of the circumstantial-evidence analysis, we continue by determining whether "the circumstances proved are consistent with guilt." *Id.* (quotations omitted). Ryan does not argue that he was not the person who fired the handgun or that he did not do so intentionally. Similarly, he does not argue that he did not engage in an attempt. He argues only that the circumstantial evidence is capable of proving only that he shot at T.H.'s house, not that he shot at persons inside the house. But that argument is based on a mistaken premise about the state of mind necessary for a general-intent crime. The state contends that Ryan's intent to intentionally fire the handgun is demonstrated by the fact that 14 shots were fired, 10 of which entered T.H.'s house through the back kitchen window. We agree with the state that the circumstances proved support a reasonable inference that Ryan intended to fire the handgun. Accordingly, the circumstances proved are consistent with the jury's verdict.

At the second step of the circumstantial-evidence analysis, we also must determine whether the circumstances proved are "inconsistent with any rational hypothesis except that of guilt." *Id.* (quotations omitted). Ryan does not attempt to identify any rational hypothesis that might be inconsistent with his guilt. Accordingly, the circumstances proved are "inconsistent with any rational hypothesis except that of guilt." *See id.* (quotations omitted).

Thus, the evidence is sufficient to prove that Ryan is guilty of second-degree assault.

12

## C.    First-Degree Assault

Ryan also argues that the evidence is insufficient to prove his guilt of first-degree assault, the charge alleged in count 2.  The district court did not adjudicate guilt or impose a sentence on that count.  "A defendant may appeal as of right from any adverse final judgment . . . ."  Minn. R. Crim. P. 28.02, subd. 2(1).  "A final judgment within the meaning of these rules occurs when the district court enters a judgment of conviction and imposes or stays a sentence."  *Id.*  Because the district court did not adjudicate guilt and impose a sentence on count 2, there is no final judgment on count 2.  Because there is no final judgment on count 2, Ryan may not challenge the sufficiency of the evidence with respect to that charge.  *See State v. Ashland*, 287 N.W.2d 649, 650 (Minn. 1979) (refusing to consider sufficiency-of-evidence argument with respect to charges for which defendant was found guilty but not sentenced).  Thus, we decline to consider Ryan's argument that the evidence is insufficient to prove his guilt on the charge of first-degree assault.  *See id.*  Ryan's argument is preserved, in the event that Ryan later is convicted of the charge alleged in count 2.

## II.  Prosecutorial Misconduct

Ryan next argues that he is entitled to a new trial on the ground that the prosecutor engaged in prosecutorial misconduct during closing argument.

The right to due process includes the right to a fair trial.  *State v. Duol*, 25 N.W.3d 135, 141 (Minn. 2025).  "Prosecutors have an affirmative obligation to ensure that a defendant receives a fair trial."  *State v. Jones*, 753 N.W.2d 677, 686 (Minn. 2008)

13

(quotation omitted). Consequently, prosecutorial misconduct may result in the denial of a fair trial. *State v. Ramey*, 721 N.W.2d 294, 300 (Minn. 2006).

Ryan argues that the prosecutor engaged in misconduct by stating, when discussing the three counts of second-degree assault, that "the trauma and the fear that [T.H.'s] children felt, that their mother felt" during the shooting "has to be accounted for in the criminal liability of this case." Ryan contends that the statement is improper on the ground that it misstates the evidence because, he asserts, no evidence was introduced of trauma or fear experienced by T.H. or her children. *See State v. Porter*, 526 N.W.2d 359, 363 (Minn. 1995) (stating that prosecutor's closing argument must be "based on the evidence produced at trial, or the reasonable inferences from that evidence").

Ryan did not object to the challenged statement when it was made during closing argument. Accordingly, we apply a modified plain-error test. *State v. Carridine*, 812 N.W.2d 130, 146 (Minn. 2012). To prevail under the modified plain-error test, an appellant first must establish that an error occurred. *Ramey*, 721 N.W.2d at 302. The appellant then must show that the error was plain. *Id.* "An error is plain if it was clear or obvious." *Id.* (quotations omitted). At the third step of the modified plain-error test, the burden shifts to the state to show "that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (quotations omitted). If the state does not satisfy that burden, the court proceeds to the fourth step to determine whether the plain misconduct should result in a new trial to ensure the "fairness, integrity, or public reputation of judicial proceedings." *Pulczinski v. State*, 972 N.W.2d 347, 356 (Minn. 2022).

14

The state challenges Ryan's premise that no evidence was introduced concerning trauma and fear experienced by T.H. and her children. The state points to T.H.'s testimony that, during the shooting, her children felt "sheer panic—they were scared." T.H. also testified that, at the time of the shooting, T.H.'s daughter "was heartbroken" and "afraid" that her brother would not survive. T.H. further testified that the shooting was a "significant, traumatic experience" for her young children. In addition, T.H. testified that she herself was scared because she did not know whether her son would survive his injuries. Accordingly, the challenged statement was based on evidence introduced at trial.

Thus, the prosecutor did not engage in prosecutorial misconduct.

### III. Hearsay Evidence

Ryan last argues that the district court erred by admitting hearsay statements made during a recorded telephone call between Meyers and her mother while Meyers was in jail. During the conversation, Meyers admitted that she drove the vehicle used in the shooting. Meyers also made numerous other statements, including statements that she was doing what she was "told to do," that Ryan "said he'd take the blame, as he should," and that Ryan was "on camera, so there's like no denying it."

During trial, the state gave advance notice of its intent to offer the audiorecording of the six-minute telephone call. Ryan objected on the ground that Meyers's statements were not statements against interest and, thus, not within an exception to the hearsay rule. *See* Minn. R. Evid. 804(b)(3). Ryan's attorney argued in the alternative that, if any of Meyers's statements are deemed to be statements against interest, the district court should "parse out" those statements and admit only those statements, not the entire statement. The

15

district court overruled the objection. The audiorecording was admitted during the testimony of a law-enforcement officer and was played for the jury in its entirety, with two small redactions. In addition, the jury was given a transcript of the recorded conversation.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801(c). As a general rule, hearsay is inadmissible. Minn. R. Evid. 802. But the rules of evidence provide numerous exceptions to the general rule of exclusion. *See* Minn. R. Evid. 803, 804. One such exception is a statement against interest. Minn. R. Evid. 804(b)(3).

A statement against interest is "[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *Id.* If a district court admits out-of-court statements under this exception, the district court must "construe the term 'statement' narrowly and allow only those statements that directly inculpate the declarant and not admit a larger narrative that merely contains some inculpating statements." *State v. Tovar*, 605 N.W.2d 717, 723 (Minn. 2000). Statements of arrested accomplices may be admitted only if they are "truly self-inculpatory, rather than merely attempts to shift blame or curry favor." *State v. Morales*, 788 N.W.2d 737, 764 (Minn. 2010). In addition, "Rule 804(b)(3) does not consider whether an entire [statement] is, on balance, against the declarant's interest." *Id.* at 763 (citing *Williamson v. United States*, 512 U.S. 594, 600-01 (1994)).

16

Rather, the rule requires district courts to "parse a declarant's generally self-inculpatory narrative to separate and omit from the narrative non-self-inculpatory declarations or remarks." *Id.* This court applies an abuse-of-discretion standard of review to a district court's admission of an out-of-court statement as a statement against interest. *Id.* at 761.

In this case, the district court did not separately evaluate each statement made by Meyers during the telephone call and did not parse out and admit only Meyer's self-inculpatory statements. Rather, the district court identified a self-inculpatory statement—that Meyers was driving during the shooting—and determined that the entire telephone call was admissible. The district court erred by admitting numerous statements that were not self-inculpatory, including statements that tend to inculpate Ryan, such as "Morris said he'd . . . take the blame, as he should," she "shouldn't be getting the same charges as him," she "just was doing what I was told to do," and "they saw him on camera, so there's like no denying it." Thus, the district court erred by admitting the entirety of the recording of the telephone call.

Given the district court's error, we must consider whether the error is prejudicial to Ryan or harmless. *See* Minn. R. Crim. P. 31.01 ("Any error that does not affect substantial rights must be disregarded."). The defendant bears the burden of showing that there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict. *State v. Bigbear*, 10 N.W.3d 48, 54 (Minn. 2024). An error is harmless if such a reasonable possibility does not exist. *Id.*

In determining whether an error is prejudicial or harmless, we "examine the entire record" because "the question is not whether the other evidence was *sufficient* to support

17

the conviction, but rather whether the error substantially influenced the verdict." *Id.* (quotations omitted). We typically consider non-exhaustive factors such as "(1) the manner in which the party presented the evidence, (2) whether the evidence was highly persuasive, (3) whether the party who offered the evidence used it in closing argument, and (4) whether the defense effectively countered the evidence." *Id.* (quotations omitted). "In addition, strong evidence of guilt undermines the persuasive value of wrongly admitted evidence." *Id.* (quotations omitted).

Before considering the non-exhaustive factors identified in *Bigbear*, we must identify the harm caused by or purportedly caused by the district court's erroneous admission of hearsay statements. Ryan contends that the hearsay statements prejudiced him in one way: by identifying him as the shooter. He asserts that Meyers, who was not a trial witness, was "the only eyewitness who put Ryan at the scene" of the crime and that all of the admissible evidence concerning Ryan's identity was circumstantial in nature.

The inadmissible hearsay evidence was presented to the jury in the form of an audiorecording. After the six-minute recording was played for the jury, the prosecutor asked a police officer, "What was significant to you about that phone call?" The officer answered by mentioning Meyers's statement that Ryan would accept responsibility and her statement that she was driving and was following instructions In closing argument, the prosecutor twice referred to Meyers's non-self-incriminating statement that Ryan would take the blame. The prosecutor referred to Meyers's non-self-incriminating statements a third time when the prosecutor stated, "You know from the videos, the photos, the phone location data, doctor testimony, police officer testimony, [T.H.'s] testimony, *and Kelci*

*Meyers's jail call* that Morris Ryan actually fired a firearm 14 times at" T.H.'s house. (Emphasis added.) In response, Ryan's attorney urged jurors to "use your own recollection" to determine what was said and to use "common sense and logic" to assess Meyers's motive for "saying what she said." In rebuttal, the prosecutor again referred to Meyers's statement that Ryan would "take the blame."

Ryan's argument that he was prejudiced by Meyers's non-self-incriminating statements is undermined by the fact that the state had a large quantity of persuasive circumstantial evidence that Ryan is the person who fired the 14 gunshots at T.H.'s kitchen window. Cell-site-location information placed Ryan's cell phone near T.H.'s home at the time of the shooting and at the nearby gas station after the shooting. The GMC Yukon used in the shooting was registered to Ryan. Surveillance videorecordings show Ryan exit the passenger side of the GMC Yukon shortly after the shooting. The handgun used in the shooting was recovered from Ryan's home and tested positive for his DNA. Against this body of circumstantial evidence, Ryan's attorney did not challenge the state's evidence of identity in closing argument; he argued only that there was reasonable doubt about Ryan's guilt because Ryan did not have a motive to kill or harm T.H. and her children and because other persons (L.C. and his cousin) might have had such a motive.

The strength of the state's circumstantial evidence of identity leads to the conclusion that Ryan has not satisfied his burden of showing that there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict. The state had a very strong case against Ryan such that, even in the absence of the non-self-incriminating statements in the jail telephone call, the result very likely would have been the same.

19

Accordingly, we conclude that there is not a reasonable probability that the non-self-incriminating statements by Meyers in the audiorecording significantly affected the verdict. *See Bigbear*, 10 N.W.3d at 54.

Thus, Ryan is not entitled to a new trial on the ground that the district court erroneously admitted inadmissible hearsay evidence.

**Affirmed.**